**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **NEW COTAI HOLDINGS, LLC,** *et al.*, | **Case No. 19-22911 (___)** |
| Debtors.[1] | **(Joint Administration Pending)** |

### DECLARATION OF JOHN BRECKER IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, John Brecker, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am a Partner of Drivetrain Advisors, LLC ("**Drivetrain**"). Drivetrain's experienced professionals — comprised of former lawyers and investment professionals with extensive experience in leading complex restructurings and maximizing value for stakeholders — assist distressed companies in various ways. They act in a fiduciary capacity (*e.g.*, litigation trustee, independent examiner, plan administrator), and serve on boards of directors, either as independent directors or as observers. They also serve in a representative capacity on creditor's committees.

2.      I received a Bachelor of Arts degree in Political Science from American University and a Juris Doctor degree from St. John's University School of Law. I practiced as a bankruptcy attorney for six years (1988-1994), first with Angel & Frankel and then with Pryor, Cashman. In 1995 I joined Credit Research & Trading, as a claims trader and in 1996 I joined

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp. (3641); New Cotai Ventures, LLC (9385). The Debtors' corporate address is c/o New Cotai, LLC, Two Greenwich Plaza, Greenwich, Connecticut 06830.

Bear, Stearns & Company's as their leading trade claims and receivables trader. In 1998, I co-founded Longacre Fund Management, a hedge fund that specialized in U.S. distressed debt investing and European distressed/stressed credit investing with a fundamentally driven, research-intensive, unlevered investment strategy.  At Longacre, I helped manage $2.7 billion of assets and grossed 8% annualized returns.  I served as a principal at Longacre until 2012.

3.        My experience serving as an independent director is extensive, and includes serving on the boards of directors/managers of, among others: (i) Ditech Holding Corporation, (ii) U.S. Well Services, Inc., (iii) Colt Manufacturing Company, (iv) Nelson Education Ltd., (v) ACA Financial Guaranty Corp., (vi) PMI Group, Inc., and (vii) Catalyst Paper Company, Inc.

4.        Based upon my experience as a bankruptcy lawyer, investor, and independent fiduciary in distressed situations, I have extensive experience engaging with, complex restructuring issues related to: (i) operating liquidity and cash flow, (ii) enterprise and asset valuation, (iii) loan documents, security interests, and creditor rights, and (iv) fiduciary duties of directors and officers.  As a practical matter, I have significant experience with bankruptcy law and policy, and understand the importance of facilitating a consensual restructuring process.

5.        I was retained as an independent fiduciary of New Cotai Holdings, LLC, New Cotai Ventures, LLC, New Cotai, LLC, and New Cotai Capital Corp. (collectively, the "**Debtors**," the "**Company**," or "**New Cotai**"), the debtors and debtors-in-possession in the above-captioned cases, on April 29, 2019.  Since that time, I have engaged in extensive discussions with the Debtors' representatives and advisors regarding the Debtors' assets and financial condition.  Based on such discussions and my review of relevant documents, I am familiar with the Debtors, their assets, their capital structure and the circumstances surrounding these Chapter 11 Cases.

6.      Concurrently with the filing of this declaration (this "**Declaration**") on the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief (collectively, the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York. Each of the Debtors is operating its business and managing its assets as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of New York (the "**United States Trustee**").  No trustee or examiner has been appointed in the Chapter 11 Cases.

7.      To facilitate the Debtors' commencement of these Chapter 11 Cases and to minimize certain of the potential adverse effects of commencing bankruptcy proceedings, the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "**First Day Pleadings**").[2]  I submit this Declaration to provide an overview of the Debtors as well as to support the Debtors' chapter 11 petitions and the First Day Pleadings as further set forth on **Exhibit A**.

8.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' representatives and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' assets and financial condition.  In making this Declaration, I have relied in part on information and materials that the Debtors' representatives and advisors have gathered, prepared, verified, and provided to me, in each case for my benefit in preparing

---

[2]      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors, and, if

called upon to testify, I would testify competently to the facts set forth herein.

9.      This Declaration is divided into three parts. Part I provides background

information about the Debtors, their assets, their corporate and capital structures, and the

circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth the

relevant facts in support of each of the First Day Pleadings. Part III sets forth information

required by Local Bankruptcy Rule 1007-2 of the Local Bankruptcy Rules of the United States

Bankruptcy Court for the Southern District of New York ("**Local Bankruptcy Rules**").

**PART I**

**BACKGROUND**

A.      **The Debtors**

10.      The Debtors in these Chapter 11 Cases are New Cotai Ventures, LLC,[3] a New

York limited liability company, New Cotai Holdings, LLC, a Delaware limited liability

company, New Cotai, LLC, a Delaware limited liability company, and New Cotai Capital Corp.,

a British Virgin Islands company limited by shares.  A chart setting forth the Debtors' corporate

ownership structure is attached hereto as **Annex 1**.  The Debtors are affiliated companies that

were formed for the purpose of investing in what is now Studio City International Holdings

Limited ("**Studio City International**").  Affiliates of investment funds managed by Silver Point

Capital, L.P. ("**Silver Point**") own a direct or indirect controlling interest in each of the Debtors.

11.      The Debtors have no employees.  The Debtors are managed by their managers,

directors, and/or officers, or indirectly through non-employed individuals who act under the

direction of the Debtors' directors and/or officers and who are employees of Silver Point.  Other

---

[3]      New Cotai Ventures, LLC's cash is held in a bank account located in White Plains, New York.

4

than with respect to their investments in Studio City International, the Debtors own no material

assets and have no material business operations.

### B.     Studio City International

12.     Studio City International, together with its subsidiaries, owns the Studio City

project, an integrated resort comprising entertainment, retail, hotel and gaming facilities located

in the Macau Special Administrative Region of the People's Republic of China ("**Macau**").  On

October 27, 2015, Studio City International opened Phase I of the Studio City project. Phase I

included the construction of the project's hotel, initial casino and non-gaming attractions.

Additional phases of construction, including expanded hotel and gaming facilities, are expected

to be completed within the next few years, in order to avoid the potential forfeiture of the project

under Macau law.

### C.     The IPO

13.     On October 22, 2018, Studio City International completed its initial public

offering (the "**IPO**") of 28,750,000 Studio City International American Depositary Shares

("**ADS**") at a price of $12.50 per ADS, representing 115,000,000 Class A ordinary shares[4] of

Studio City International.  In November 2018, the underwriters exercised their overallotment

option in full, acquiring an additional 4.3 million ADS at a price of $12.50 per ADS.

14.     Prior to the IPO, New Cotai, LLC held a 40% equity interest in Studio City

International and Melco Resorts & Entertainment Limited ("**Melco**") held a 60% equity interest

through its subsidiary, MCE Cotai Investments Limited ("**MCE**").  In October 2018, the Studio

City International board of directors, a majority of the members of which were designated by

---

[4]     Each Class A ordinary share of Studio City International entitles its holder to one vote on all matters to be voted on by shareholders generally.

5

affiliates of Melco, authorized the IPO over the objection of New Cotai, LLC and its

representatives on the Studio City International board. New Cotai, LLC did not believe that the

IPO would be in the best interests of Studio City International or its shareholders.

15.     The managing underwriters informed the Studio City International board that

successful execution of the IPO would require that the direct or indirect shareholders of Studio

City International, or its "sponsors," place substantial orders to buy shares in the IPO.  They

further advised that it would be preferable to have affiliates of both Melco and New Cotai, LLC

provide the support, if possible. Melco indicated that it was prepared to provide all of the support

that the underwriters required to the extent that New Cotai, LLC or its affiliates did not provide

support for the IPO.  New Cotai, LLC has limited financial resources, with just a few million

dollars in the bank to meet its expenses, so it had no obligation or ability to provide support in

the IPO absent a contribution by its indirect equity holders.  Such equity holders declined to

make additional investments in New Cotai, LLC or New Cotai Holdings, LLC.

16.     However, certain of such equity holders' affiliates, funds managed by Silver

Point, indicated their willingness to provide the support requested by the underwriters and placed

an order to buy ADS's at the IPO price.  Though the holders of Notes (defined below) have

never had any contractual or other right to make additional investments in New Cotai, LLC or

New Cotai Holdings, LLC, or to acquire ADS's in the IPO, New Cotai, LLC took concrete steps

to enable such holders to participate.  These steps included, among other things, (1) informing

holders of Notes of the pending IPO, (2) providing the IPO underwriters with contact

information for holders of Notes and requesting the underwriters to contact such holders, and (3)

posting the preliminary prospectus in the data site accessible by the holders of the Notes.

17.     Following the completion of the IPO, the interests in Studio City International were held as follows: (1) New Cotai held the equivalent of an approximately 23.07% interest (as described in more detail below), (2) MCE held an approximately 54.11% interest, (3) certain non-Debtor affiliates of Silver Point held an approximately 13.01% interest, and (4) public holders held an approximately 9.56% interest.

**D.      The Debtors' Current Investment in Studio City International**

18.     As of the Petition Date, Debtor New Cotai, LLC owned (i) a 23.07% voting, non-economic interest in Studio City International and (ii) a non-voting, non-shareholding economic participation interest (the "**Participation Interest**") equal to 29.9861% in MSC Cotai Limited, a company incorporated as a business company limited by shares in the British Virgin Islands ("**MSC Cotai**"), which represents the equivalent of a 23.07% economic interest in Studio City International (together, (i) and (ii) are referred to herein as the "**Investment**").

19.     The Participation Interest is subject to that certain Participation Agreement, by and among Debtor New Cotai, LLC, MSC Cotai and Studio City International, dated October 12, 2018 (the "**Participation Agreement**").  The Participation Agreement provides that Debtor New Cotai, LLC is entitled to exchange all or a portion of its Participation Interest for a number of Class A ordinary shares of Studio City International, subject to adjustments, exceptions and conditions as set out in the Participation Agreement.

20.     In connection with the IPO, Melco had the right to terminate the Studio City International shareholders' agreement (subject to the survival of limited provisions). Therefore, Debtor New Cotai, LLC entered into an amended and restated shareholders' agreement with Studio City International, Melco, and MCO Cotai Investments Limited, dated October 16, 2018 (such amended and restated shareholders' agreement, the "**Shareholders' Agreement**").

Pursuant to the Shareholders' Agreement, Debtor New Cotai, LLC has the right to appoint two members to Studio City International's eleven member board of directors and one member to certain committees of the board of directors. Melco has the right to appoint a majority of the Board of Directors and thus controls the development and operations of the Studio City project.

**E.     The 10.625% Senior Pay-In-Kind Notes**

21.     On April 19, 2013, Debtors New Cotai, LLC and New Cotai Capital Corp., as co-issuers (together, the "**Co-Issuers**"), issued $380 million aggregate principal amount of 10.625% Senior Pay-In-Kind Notes due May 2019 (the "**Notes**").[5] On July 2, 2014, the Co-Issuers issued an additional $87.5 million aggregate principal amount of Notes. The Notes were issued for the purpose of making equity contributions to the Studio City project.

22.     The Notes are unsecured obligations guaranteed by Debtor New Cotai Holdings, LLC. Interest on the Notes was payable semi-annually on May 1 and November 1, in cash or through the issuance of additional notes with the same terms as the Notes, at Debtor New Cotai, LLC's option. The Notes matured on May 1, 2019.

23.     As of the Petition Date, the total principal balance of the Notes, inclusive of interest paid-in-kind that has been added to the principal balance of the Notes, was approximately $856 million. The Notes constitute the Debtors' only prepetition funded debt obligations.

**F.     Events Precipitating the Chapter 11 Cases**

24.     The Debtors' ability to satisfy their obligations under the Notes is directly tied to the development and success of the Studio City project. Due to delays in the development of the

---

[5]     The Notes were issued pursuant to that certain Indenture, dated as of April 19, 2013, by and among the Co-Issuers, Debtor New Cotai, LLC as guarantor, and Wells Fargo Bank, National Association, as trustee. Concurrently with the 2013 issuance of Notes, non-Debtor affiliate New Cotai Participation Corp. issued 1,520 Class B shares to the same investors who acquired such Notes, on a pro rata basis.

Studio City project, a reduced allocation of gaming tables from the government, and some

unanticipated declines in the Macau gaming market, the Investment has not yet achieved

sufficient market value in light of the highly illiquid and unreliable market conditions that have

developed following the IPO, making a refinancing impracticable.  Therefore, through no fault of

their own, the Debtors were unable to satisfy the Notes obligations by their maturity.

25.     More specifically, the Studio City project only opened its first phase of

development in October 2015.  Construction costs came in greater than expected and the project

required an additional $300 million of capital in June 2014.  Additionally, the initial gaming

table allocation of 250 mass table games was significantly fewer than expected and contained no

allocation of VIP tables.  The Studio City project and its operations are therefore still in their

ramp-up phase, and while Studio City International is focused on driving performance, the

Studio City project has not yet achieved the financial and operational performance necessary to

meet all of the project's capital requirements.

26.     In addition, under the terms of the land grant for the Studio City project, the

second phase of development was initially required to be completed by July 24, 2018.  However,

in October 2016, an application requesting an extension of the development period was filed

with the Macau government.  In February 2018, the Macau government granted an extension of

the development period under the land grant, extending the required completion date of the

second phase of development of the Studio City project from July 24, 2018 to July 24, 2021.

Therefore, Studio City International may not complete the second phase of development until

July 2021 (or potentially later if it is granted a further extension of the development period).

Studio City International is expected to open Phase 2 in a timely manner, as the failure to do so

could result in the forfeiture of the Studio City project to the Macau government, including Phase

1.  The second phase of development will provide the project with much needed additional gaming space, non-gaming attractions and hotel rooms.

27.     Notwithstanding the aforementioned challenges, the Debtors believe that the Investment continues to represent a significant economic opportunity—the value of which is not accurately represented in the current market prices of the ADS.  Indeed, should the Studio City project continue to develop on its currently anticipated timeframe, the Debtors expect the Investment to generate sufficient value to repay the Notes in full.

28.     Prior to the Petition Date, the Debtors commenced discussions with an ad hoc group of holders of Notes (the "**Ad Hoc Group**") that collectively holds more than a majority of the aggregate principal amount of the Notes.  The Debtors intend to continue to engage with the Ad Hoc Group in good faith and at arms'-length with the goal of achieving a consensual restructuring in these Chapter 11 Cases

### G.     DIP Financing

29.     Once the Debtors determined that they were unlikely to reach a deal with the Ad Hoc Group in time to avoid a maturity default under the Notes, the Debtors quickly began to prepare for an in-court process. As of the Petition Date, the Debtors held approximately $1.281 million in their bank accounts.  Such cash is expected to be sufficient to sustain the Debtors for the first approximately 30 days of these cases.  However, as holding companies without the benefit of cash generating assets, the Debtors must look to outside sources for further funding.

30.     Silver Point provided the Debtors' investment bankers at Houlihan Lokey Capital, Inc. ("**Houlihan**") with the terms of potential debtor-in-possession financing (the "**DIP Financing**"), which included the following terms: (1) aggregate financing up to $6.25 million, (2) no milestones, (3) 12 month maturity that, at the Debtors' option (and upon the satisfaction of

certain conditions), could be extended by an additional 12 months, (4) no budgetary compliance covenants, (5) interest rate of LIBOR plus 7.00% and (6) minimal fees (a 1.00% commitment fee) or other charges to the Debtors' estates.  The DIP Financing would be secured by substantially all of the Debtors' assets and subject to other customary protections made available to debtor-in-possession lenders.

31.      Due to the fact that the Debtors have a limited cash runway, the Debtors did not solicit financing proposals from other sources prepetition. However, as further described in the Houlihan Declaration submitted concurrently herewith in support of the DIP Financing, the DIP Financing terms achieved with Silver Point are favorable as compared to prevailing market terms for similar debtor-in-possession financing facilities.  Moreover, the Debtors intend to solicit proposals from other parties during the interim period, including members of the Ad Hoc Group. In the event that the Debtors receive a proposal superior to the Silver Point proposal, the Debtors will seek the Bankruptcy Court's approval of such superior proposal.

32.      The DIP Financing will allow the Debtors to ensure stability and to smoothly transition into these Chapter 11 Cases. The primary use of the DIP Financing will be for working capital purposes and to satisfy the Debtors' expenses in connection with the negotiation of a restructuring of the Notes with the Ad Hoc Group.

## PART II

## FIRST DAY PLEADINGS[6]

33.      To facilitate their restructuring efforts, the Debtors have filed the First Day Pleadings concurrently with this Declaration, and respectfully request that this Court enter the

---

[6]    Capitalized terms used but not defined in Part II have the meanings ascribed to them in the relevant First Day Pleadings.

proposed orders granting such First Day Pleadings. I have reviewed each of the First Day

Pleadings and proposed orders (including the exhibits thereto), and the facts set forth therein are

true and correct to the best of my knowledge, information, and belief. I believe that the relief

sought in each First Day Pleading (a) is vital to enable the Debtors to transition into Chapter 11

with minimum interruption or loss of value and (b) constitutes a critical element in maximizing

value during these Chapter 11 Cases.

I.      **Administrative Pleadings (Items 1 through 4)**

34.     The Debtors have filed four "administrative" pleadings that seek to (a) jointly

administer the Chapter 11 Cases for procedural purposes only, (b) authorize the Debtors to file a

consolidated list of creditors, (c) grant the Debtors additional time to file their schedules and

statements, and (d) authorize the Debtors to retain Prime Clerk LLC ("**Prime Clerk**") as claims

and noticing agent.

A.      **Joint Administration (Item 1)**

35.     The Debtors are requesting that the Chapter 11 Cases be jointly administered for

procedural purposes only. As set forth above, the Debtors are affiliated with each other. Joint

administration of these cases will avoid the unnecessary time and expense of duplicative

motions, applications, orders, and other papers and related notices that otherwise would need to

be filed in all of the cases absent joint administration. Accordingly, joint administration will save

considerable time and expense.

**B.**      **Motion to File Consolidated List of Creditors (Item 2)**

36.      The Debtors seek entry of any order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and granting related relief.

37.      I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Under the circumstances, reformatting the Creditor List, preparing and filing separate formatted creditor matrices, and otherwise complying with the List-Filing Requirements will unnecessarily burden the Debtors, without any corresponding benefit to the estates.

**C.**      **Motion Extending Time to File Schedules and Statements (Item 3)**

38.      The Debtors are requesting (a) a 14-day extension of time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") and (b) permission to file their monthly operating reports required by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the Executive Office of United States Trustees (rev. 11/27/13) (the "**U.S. Trustee Guidelines**") by consolidating the information required for each Debtor in one report that tracks and breaks out all the specific information (*e.g.*, receipts, disbursements, etc.) on a debtor-by-debtor basis in each monthly operating report ("**MOR**"). I believe that, given the substantial burdens already imposed on the Debtors' representatives by the commencement of these Chapter 11 Cases, the fact that the Debtors have no employees of their own, the competing demands upon the Debtors' representatives and professionals, and the time and attention the Debtors must devote to the restructuring process, cause exists to extend the deadline to file a list the Debtors' Schedules and Statements. The requested extension will enhance the accuracy of the Statements

13

and Schedules when filed and help avoid the potential necessity of substantial subsequent

amendments. I do not believe that any party-in-interest will be prejudiced by the requested

extension of time.

39.        Furthermore, I believe that consolidating the information required by the U.S.

Trustee Guidelines for each Debtor in one report that tracks and breaks out all specific

information on a debtor-by-debtor basis will promote efficiency in these Chapter 11 Cases

without prejudicing any party-in-interest, as the MORs would accurately reflect the Debtors'

business operations and financial affairs.

### D.        Application to Retain Prime Clerk as Claims and Noticing Agent (Item 4)

40.        The Debtors seek authority to retain Prime Clerk as claims and noticing agent in

the Chapter 11 Cases. I believe that Prime Clerk's retention is the most effective and efficient

manner of noticing these creditors and parties-in-interest of the filing of the Chapter 11 Cases

and other developments in the Chapter 11 Cases. In addition, Prime Clerk will transmit, receive,

docket, and maintain proofs of claim filed in connection with the Chapter 11 Cases. Accordingly,

I believe that retention of Prime Clerk, an independent third party with significant experience in

this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates

and their creditors.[7]

## II.        Operational Pleadings (Items 5 through 7)

41.        The Debtors have filed three "operational" pleadings that seek to (a) authorize the

Debtors to continue using their Cash Management System (as defined below), (b) authorize the

---

[7]     The Debtors intend to file a subsequent application to retain Prime Clerk to perform certain administrative
        services under Bankruptcy Code section 327.

Debtors to maintain insurance coverage and pay related obligations, and (c) authorize the

Debtors to pay Taxes and Assessments (as defined below).

### A.     Motion to Continue Cash Management System (Item 5)

42.     The Debtors are seeking entry of an order (a) authorizing, but not directing, the

Debtors to maintain their existing cash management system and bank accounts (the "**Cash**

**Management System**"); (b) modifying certain operating guidelines relating to bank accounts set

forth in the U.S. Trustee Guidelines; (c) authorizing, but not directing the payment of related

prepetition obligations; (d) authorizing, but not directing the Debtors to continue using existing

checks, business letterhead, purchase orders, invoices, envelopes, and other business forms and

correspondence (collectively, the "**Business Forms**"); (e) modifying certain requirements under

section 345(b) of the Bankruptcy Code; and (f) authorizing, but not directing, the continuation of

various intercompany transactions among the Debtors and certain non-Debtor affiliates (the

"**Intercompany Transactions**") and the accordance of administrative-expense-priority status to

all claims arising postpetition in the ordinary course of business as a result of an Intercompany

Transaction (such postpetition claims, the "**Intercompany Claims**").

43.     *Cash Management System*. The Debtors' Cash Management System is not

complicated. It consists of only seven bank accounts held by three of the four Debtors. As

holding companies, the Debtors do not have a business need for frequent or sophisticated cash

transfers. The Cash Management System is tailored to the Debtors' needs and facilitates basic

reporting, monitors collection and disbursement of funds, reduces administrative expenses by

facilitating the movement of funds, and administers the various Bank Accounts (as defined

below) required to effect the collection, disbursement, and movement of cash.

44.     As of the date hereof, Debtor New Cotai Holdings, LLC maintains two cash accounts at Citibank, N.A., Debtor New Cotai, LLC maintains two cash accounts at Citibank, N.A. and one cash account at U.S. Bank, National Association, and Debtor New Cotai Ventures, LLC maintains two cash accounts at Bank of America, N.A. (collectively, the "**Bank Accounts**"), each of which is used to manage cash receipts and disbursements required to pay expenses incurred by the Debtors, such as vendor and professional fees. As of the Petition Date, the Bank Accounts had an aggregate combined balance of approximately $1.281 million.

45.     In connection with the Cash Management System, the Debtors may incur fees and other charges (collectively, all such fees and charges, the "**Bank Account Claims**") in connection with (a) checks which have been dishonored or returned for insufficient funds in the applicable amount, and (b) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "**Bank Account Agreements**"). The Debtors estimate that outstanding Bank Account Claims are de minimis as of the Petition Date.

46.     *Business Forms*. The Debtors use Business Forms, such as checks, invoices, and letterhead, in the ordinary course of business. Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors-in-possession. Nonetheless, parties doing business with the Debtors will be aware of the Debtors' status as debtors-in-possession as a result of the public nature of these Chapter 11 Cases, the limited number of parties that do business with the Debtors, and the notice of commencement served on parties-in-interest. Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

16

47.    *Intercompany Transactions*. In the ordinary course of business, the Debtors
engage in various transactions relating to expenses and obligations that the Debtors incur. These
Intercompany Transactions are primarily used to fund the payment of various vendors and
professionals, such as auditing firms or counsel. Prior to the Petition Date, from time-to-time the
Debtors' non-Debtor parent companies (the "**Non-Debtor Parents**") funded the Debtors through
capital calls or other equity contributions. In addition, depending on the timing of the Debtors'
payment obligations, certain of the Debtors' other non-Debtor affiliates (the "**Non-Debtor
Payors**") may directly pay the Debtors' counterparties. The Debtors thereafter reimburse such
paying affiliates out of the Debtors' Bank Accounts. In the ordinary course of business, the
Debtors may engage in additional routine Intercompany Transactions. The Debtors anticipate
that the Intercompany Transactions with respect to the reimbursement of Non-Debtor Payors (but
not with respect to equity contributions from the Non-Debtor Parents) will continue postpetition
in the ordinary course of business.

48.    The Intercompany Transactions reduces administrative costs by facilitating the
movement of funds. If the Debtors cannot continue the Intercompany Transactions, their
ordinary course operations would be unnecessarily hindered.

49.    *Relief from the Requirements of Section 345*. I believe that the Debtors' Cash
Management System and Bank Accounts comply with section 345 of the Bankruptcy Code. Each
of the Debtors' Bank Accounts is maintained by an FDIC-insured depository that has signed a
Uniform Depository Agreement.[8] Nonetheless, to the extent the Cash Management System and

---

[8]    According to the list of Southern District of New York Authorized Bank Depositories (as of April 1, 2019),
Bank of America, N.A. and Citibank, N.A. are not taking new accounts. However, in mega-cases in which the
Debtor maintains accounts with these banks, the U.S. Trustee will instruct the Debtor to check with the bank to
ensure that they will collateralize the funds with the Federal Reserve or obtain a surety bond to cover the funds.
*(cont'd)*

the Bank Accounts do not strictly comply with Bankruptcy Code section 345, the Debtors

request that they be permitted to maintain their Bank Accounts in accordance with their existing

practices, for a 45-day period commencing upon entry of the Interim Order.

50.     Accordingly, I believe that the Debtors' request for relief from section 345 is

warranted.

**B.     Insurance Motion (Item 6)**

51.     As holding companies, the Debtors' insurance needs are not complex.

Specifically, the Debtors' insurance program consists of a primary directors and officers liability

policy as well as a single layer of excess coverage (collectively, the "**Insurance Policies**"). The

named insured under the Insurance Policies is Debtor New Cotai Ventures, LLC. The Insurance

Policies provide coverage to each of the Debtors' directors and officers. For the current policy

periods, which end December 28, 2019, the total annual insurance premiums under the Insurance

Policies totaled approximately $81,882.

52.     It is my understanding that the coverage types, levels, and premiums for these

Insurance Policies are typical for comparably sized holding companies similarly situated to the

Debtors. The Debtors believe that no amounts are currently outstanding on the Insurance

Policies. However, out of an abundance of caution, the Debtors seek authorization to make

payments of premiums, deductibles, administration costs, and brokers' fees arising under the

Insurance Policies attributable to the prepetition period (plus any unforeseen deductible payment

amounts for prepetition claims), including any premium adjustments that might come due after

the Petition Date.

---

*(cont'd from previous page)*
The relief requested in the motion to continue the Cash Management System includes a waiver of any such
requirement to the extent it is applicable.

53.    If the Debtors are unable to make any payments that may be owed on account of the Insurance Policies, including on account of a premium adjustment, I believe that the unpaid third-party insurance carriers (collectively, the "**Insurance Carriers**") may seek relief from the automatic stay to terminate such Insurance Policies. The Debtors then would be required to obtain replacement insurance on an expedited basis and at a significant cost. Even if these Insurance Providers were not permitted to terminate the agreements, any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

### C.    Taxes Motion (Item 7)

54.    In the ordinary course of business, the Debtors incur (a) business taxes required by the state of Connecticut to remain in good standing in order to conduct business within the state (the "**Taxes**") and (b) periodic corporate and limited liability fees required to maintain the existence of business entities in the state of Delaware, the state of New York, and the British Virgin Islands (the "**Assessments**"). The Debtors pay or remit, as the case may be, the Taxes and Assessments as incurred, or annually, or biennially to various state and other authorities (the "**Applicable Authorities**"), as required by applicable laws and regulations. To the best of the Debtors' knowledge, the Debtors were current in the payment of assessed and undisputed Taxes and Assessments that came due and payable prior to the Petition Date; however, certain Taxes and Assessments attributable to the prepetition period may become due.

55.    I believe that delayed payment of the Taxes and Assessments may cause the Applicable Authorities to take disruptive actions, including cancelling or failing to renew necessary permits or authorizations, audits, lien filings, moving for relief from the automatic stay, and other administrative procedures, all of which would consume valuable time and resources and divert the Debtors' attention from their restructuring efforts. I further believe that

prompt and regular payment of the Taxes and Assessments will avoid these unnecessary and disruptive actions.

## PART III

## INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

56.     It is my understanding that Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain information, which is set forth below.[9]

57.     As required under Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the Ad Hoc Group of holders of Notes is the only committee organized prior to the Petition Date.  The Ad Hoc Group is represented by Akin Gump Strauss Hauer & Feld LLP.  The names and addresses of the members of the Ad Hoc Group, to the best of the Debtors' knowledge, is as follows:

| Member | Address |
|---|---|
| Arkkan Capital Management Limited | 23/F, 8 Queen's Road Central Hong Kong |
| Fidelity Management & Research Co. | Fidelity Investments 200 Seaport Blvd, V13H Boston, MA 02110 |
| Highbridge MSF International and 1992 Asia Strategies Master Fund LP | Highbridge Capital Management (Hong Kong) Limited 1401 York House, 15 Queen's Road, Central, Hong Kong |
| Nine Masts Capital Limited for and on behalf of Nine Masts Investment Fund and MAP 128 Segregated Portfolio LMA SPC | Nine Masts Capital Limited 23/F Shanghai Commercial Bank Tower 12 Queen's Road Central Central, Hong Kong |

---

[9]     The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Member | Address |
|---|---|
| Redwood Capital Management | Redwood Capital Management<br>910 Sylvan Avenue<br>1st Floor<br>Englewood Cliffs, NJ 07632 |
| Tor Investment Management (Hong Kong) Limited | 19/F, Henley Building<br>5 Queen's Road Central,<br>Hong Kong |
| Ivy Investment Management Company,<br>as investment advisor for the following funds:<br>Ivy High Income Fund,<br>Ivy VIP High Income Fund,<br>Ivy High Income Opportunities Fund,<br>Ivy Apollo Multi-Asset Income Fund, and<br>Ivy Apollo Strategic Income Fund<br>Ivy Asset Strategy Fund | 6300 Lamar Avenue<br>Overland Park, KS 66202 |

58.     As required under Local Bankruptcy Rule 1007-2(a)(4), **Exhibit B** lists the following information with respect to each of the holders of the Debtors' 20 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on **Exhibit B** are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

59.     As required under Local Bankruptcy Rule 1007-2(a)(5), **Exhibit C** provides the following information with respect to each of the holders of the five largest secured claims against the Debtors on a consolidated basis: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

21

60.     As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtors submit that as of December 31, 2018, the Debtors' combined assets were $310,120,178 and the Debtors' combined liabilities were $447,501,736.[10]

61.     As required under Local Bankruptcy Rule 1007-2(a)(7) and as set forth on **Exhibit D**, to the best of the Debtors' knowledge and belief, no shares of stock, debentures or other securities of the Debtors are publicly held.

62.     As required under Local Bankruptcy Rule 1007-2(a)(8), **Exhibit E** provides a list of all the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

63.     As required under Local Bankruptcy Rule 1007-2(a)(9), **Exhibit F** provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

64.     As required under Local Bankruptcy Rule 1007-2(a)(10), **Exhibit G** provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of assets held by the Debtors outside the territorial limits of the United States.

65.     As required under Local Bankruptcy Rule 1007-2(a)(11), **Exhibit H** provides a list of the nature and present status of actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

---

[10]    The liabilities with respect to the Notes are determined at fair value consistent with historical practice.

66.     As required under Local Bankruptcy Rule 1007-2(a)(12), **Exhibit I** provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

67.     As required under Local Bankruptcy Rule 1007-2(b)(1)-2(A) and (C), **Exhibit J** provides the estimated amounts proposed to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the thirty-day period following the Petition Date.  The Debtors have no employees or payroll obligations.

68.     As required under Local Bankruptcy Rule 1007-2(b)(3), **Exhibit K** provides the estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees, on a consolidated basis for the 30-day period following the Petition Date.

*[Remainder of Page Intentionally Left Blank]*

Dated: New York, New York
       May 1, 2019

                                        _/s/ John Brecker_____
                                        John Brecker
                                        Independent Board Member

## **<u>Annex 1</u>**

**Organizational Chart**



## EXHIBIT A

### List of Papers Seeking First-Day Relief

1. Debtors' Motion for Entry of Order (I) Directing Joint Administration of Cases (II) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rule 1005 and 2002(n)

2. Debtors' Motion for Order Authorizing the Establishment of Certain Notice, Case Management, and Administrative Procedures

3. Debtors' Motion for Entry of Order (I) Waiving Certain Creditor-List Filing Requirements; (II) Authorizing the Filing of a Consolidated List of Top 20 Unsecured Creditors; (III) Authorizing Debtors to Establish Procedures for Notifying Parties of the Commencement of These Cases

4. Debtors' Motion for Entry of an Order (I) Extending Time for Debtors to File Schedules and Statements and (II) Authorizing Debtors to File Consolidated Monthly Operating Reports

5. Debtors' Application for Order Appointing Prime Clerk LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date

6. Debtors' Motion for Entry of Interim and Final Orders  (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms, and Payment of Related Prepetition Obligations, (II) Modifying Certain Deposit Requirements, and (III) Authorizing Continuance of Intercompany Transactions and Honoring Certain Related Prepetition Obligations

7. Debtors' Motion for Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay all Insurance Obligations Arising Thereunder and (II) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies

8. Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Taxes and Related Obligations

9. Debtors' Motion for Entry of a Final Order Under 11 U.S.C. § 364, Bankruptcy Rules 4001 and 9014, and Local Bankruptcy Rule 4001-2 (I) Authorizing the Debtors to Obtain Postpetition Financing

## EXHIBIT B

### Consolidated List of the Holders of the Debtors' 20 Largest Unsecured Claims

Pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure, set forth below is a list of creditors holding the twenty (20) largest unsecured claims against New Cotai Holdings, LLC, New Cotai, LLC, New Cotai Capital Corp., and New Cotai Ventures, LLC (collectively, the "**Debtors**"), as of approximately April 29, 2019. This list has been prepared on a consolidated basis, based upon the books and records of the Debtors. The information presented in the list below shall not constitute an admission by, nor is it binding on, the Debtors.

This List of Creditors does not include (a) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101 or (b) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total Claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 1. Wells Fargo Bank, National Association, as Indenture Trustee to the 10.625% Senior Pay-In-Kind Notes due 2019 | Wells Fargo Bank, National Association 707 Wilshire Boulevard, 17th Floor Los Angeles, CA 90017  Attention: Corporate Trust Department, Barry Somrock Phone: 612-667-8485 Fax: (213) 614-3355 Email: barry.d.somrock@wellsfargo.com | 10.625% Senior Pay-In-Kind Notes due 2019 | | | | $856,000,000 |
| 2. PricewaterhouseCoopers LLP | PricewaterhouseCoopers LLP P.O. Box 7247-8001, Philadelphia, PA 19170-8001  Attention: Anthony Arrigo Phone: 646-471-0156 Email: anthony.arrigo@pwc.com | Professional Services | | | | $127,500 |
| 3. SS&C Technologies, Inc. | SS&C Technologies, Inc. One South Road, Harrison, NY 10528  Attention: Billing Department Phone: 914-670-3600 Fax: 914-670-3607 Email: Billing.Citi@sscinc.com | Professional Services | | | | $56,541.13 |
| 4. Kekst and Company Incorporated | Kekst and Company Incorporated 437 Madison Avenue 37th Floor, New York, NY 10022  Attention: NYC Accounting Department Phone: 212-521-4800 Fax: 212-521-4900 Email: accounting.nyc@kekstcnc.com | Professional Services | | | | $15,372.23 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total Claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 5. | Union Gaming Securities LLC | Union Gaming Securities LLC 3930 Howard Hughes Pkwy, Ste 230 Las Vegas, NV 89169  Attention: Mike Glynn Phone: 702-866-0749 Email: mike.glynn.uniongaming.com | Professional Services | | | | $10,000.00 |
| 6. | Conyers Dill and Pearman - HK | Conyers Dill and Pearman – HK 29th Floor One Exchange Square, 8 Connaught Place, Central, Hong Kong  Attention: David Lamb Phone: 852-2524-7106 Fax: 852-2845-9268 Email: David.Lamb@conyersdill.com | Professional Services | | | | $7,989.20 |
| 7. | Ropes & Gray, LLP | Ropes & Gray, LLP 800 Boylston Street, Boston, MA, 02199-3600  Attention: P. Welsh Phone: 617-951-7865 Fax: 617-951-7050 Email: pwelsh@ropesgray.com | Professional Services | | | | $7,427.23 |
| 8. | Wells Fargo Bank | Wells Fargo Bank WF 8113 P.O. Box 1450, Minneapolis, MN 55485-8113  Attention: Barry Somrock Phone: 612-667-8485 Email: barry.d.somrock@wellsfargo.com | Professional Services | | | | $7,100.00 |
| 9. | Walkers | Walkers 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands  Attention: Kimberly Ebanks Phone: 345-949-0100 Fax: 345-949-7886 Email: Kimberley.Ebanks@walkersglobal.com | Professional Services | | | | $6,555.84 |
| 10. | CorpM Limited | CorpM Limited Avenida da Praia Grande, 409, China Law Building, 21/F and 23/F A-B, Macau  Attention: Rui Pinto Proenca Phone: 853-2833-3332 Fax: 853-2833-3331 Email: rpp@mdme.com.mo | Professional Services | | | | $6,223.30 |
| 11. | 2NT8 Limited | 2NT8 Limited 4/F Wai Lam House, 12 Lan Kwai Fong, Central, Hong Kong  Attention: Alidad Tash Phone: 852-5196-2211 Email: alidad@2nt8.com | Professional Services | | | | $5,000.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total Claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 12. | Intralinks, Inc. | Intralinks, Inc. 1372 Broadway, 11th Floor, New York, NY 10018<br><br>Attention: Billing Department Phone: 212-342-7676 Email: Billing@Intralinks.com | Trade Debt | | | | $4,500.00 |
| 13. | Richards Kibbe & Orbe LLP | Richards Kibbe & Orbe LLP 200 Liberty Street, New York, NY 10281-1003<br><br>Attention: C. Mueller Phone: 212-530-1800 Fax: 212-530-1801 Email: cmueller@rkollp.com | Professional Services | | | | $3,021.75 |
| 14. | DF King & Co., Inc. | DF King & Co., Inc. 48 Wall Street 22 Floor, New York, NY 10005<br><br>Attention: DFK Accounts Receivable Phone: 212-269-5550 Email: DFKAccountsReceivable@astfinancial.com | Professional Services | | | | $2,968.78 |
| 15. | Ernst & Young US LLP | Ernst & Young US LLP 200 Plaza Drive, Secaucus, NJ 07094<br><br>Attention: Alexander Soures Phone: 212-773-2584 Fax: 866-240-5838 Email: alexander.soures@ey.com | Professional Services | | | | $2,294.00 |
| 16. | Iron Mountain | Iron Mountain 1000 Campus Drive, Collegeville, PA 19426<br><br>Attention: Customer Service Phone: 800-934-3453 Email: askcustomerservice@ironmountain.com | Professional Services | | | | $1,030.56 |
| 17. | Hogan Lovells US LLP | Hogan Lovells US LLP Columbia Square 555 Thirteenth Street NW, Washington, DC 20004-1109<br><br>Attention: Bibi Majeed Phone: 202-637-5600 Fax: 202-637-5910 Email: bibi.majeed@hoganlovells.com | Professional Services | | | | $769.47 |
| 18. | Verizon Wireless | Verizon Wireless P.O. Box 489 Newark, NJ 07101-0489 Phone: 800-922-0204 | Trade Debt | | | | $61.15 |
| 19. | Vonage Business | Vonage Business P.O. Box 392415 Pittsburgh, PA 15252-9415 | Trade Debt | | | | $49.32 |

3

| Name of creditor and complete mailing address, including zip code | | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total Claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 20. | Verizon | Verizon P.O. BOX 15124, Albany, NY 12212-5124  Attention: Customer Service Phone: 800-897-4966 | Trade Debt | | | | $45.72 |

4

## <u>EXHIBIT C</u>

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor Name | Creditor Contact | Amount of Claim | Collateral Description and Value |
|---|---|---|---|
| None. | | | |
| | | | |
| | | | |

## <u>EXHIBIT D</u>

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the stock held by each of the debtors' officers and directors and the amounts so held.

| Directors and Officers | Common Share Amount and Nature of Beneficial Ownership as of April 29, 2019 |
|---|---|
| None. | |
| | |
| | |

## <u>EXHIBIT E</u>

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certificates representing shares in Studio City International Holdings Limited.

## <u>EXHIBIT F</u>

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City, State | Country | Owned or Leased |
|---|---|---|---|
| None. | | | |
| | | | |

## EXHIBIT G

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

### Location of Debtors' Substantial Assets

Bank of America, N.A.
206 Main Street
White Plains, NY 10601

U.S. Bank National Association
50 South 16th Street
Philadelphia, PA 19102

Citibank, N.A.
153 East 53rd Street
New York, NY 10022

### Location of the Books and Records

Two Greenwich Plaza
First Floor
Greenwich, CT 06830

### Debtors' Assets Outside the United States

None.

## <u>EXHIBIT H</u>

### Summary of Legal Actions Against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these Chapter 11 Cases.

| Entity | Case Caption | Case No. | Court and Jurisdiction | Nature of Claim | Status |
|---|---|---|---|---|---|
| None. | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## EXHIBIT I

### The Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Debtor | Name of Directors/Managers and Officers | Titles/Responsibilities | Approx. Dates Appointed |
|---|---|---|---|
| New Cotai, LLC | Michael Gatto<br>Anna Kanterakis<br>David Reganato | President<br>Treasurer<br>Secretary | 6/9/2011<br>4/11/2013<br>4/30/2014 |
| New Cotai Holdings, LLC | Michael Gatto<br>Anna Kanterakis<br>David Reganato | President<br>Treasurer<br>Secretary | 6/21/2006<br>4/11/2013<br>6/25/2014 |
| New Cotai Capital Corp. | David Reganato<br>Michael Gatto<br>Anna Kanterakis | Director<br>President & Secretary<br>Treasurer | 3/21/2014<br>4/18/2013<br>4/18/2013 |
| New Cotai Ventures, LLC | Michael Gatto<br>David Reganato | Manager (Board)<br>Manager (Board) | 10/31/2018<br>10/31/2018 |

## <u>EXHIBIT J</u>

**Debtors' Payroll for the 30 Day Period Following the Petition Date**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

Estimated amount of weekly payroll to employees (exclusive of officers, directors, and stockholders):  None.

Estimated amount paid and proposed to be paid to officers, stockholders, and directors:

None.

Amount paid or proposed to be paid to financial and business consultants:  None.

**EXHIBIT K**

**Debtors' Estimated Cash Receipts and Disbursements for the
Thirty-Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| Estimated Cash Receipts | $0 |
| Estimated Disbursements | Approximately $6,320 |
| Net Cash Loss | Approximately $6,320 |
| Accrued but Unpaid Obligations (other than professional fees) | $0 |
| Accrued but Unpaid Receivables | $0 |