SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Evan A. Hill
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **NEW COTAI HOLDINGS, LLC,** *et al.*, | **Case No. 19-22911 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER**
**UNDER 11 U.S.C. § 364, BANKRUPTCY RULES 4001 AND**
**9014, AND LOCAL BANKRUPTCY RULE 4001-2**
**AUTHORIZING THE DEBTORS TO OBTAIN**
**<u>POSTPETITION FINANCING</u>**

New Cotai Holdings, LLC, and certain of its affiliates (collectively, the

"**Debtors**," the "**Company**," or "**New Cotai**"), the debtors and debtors-in-possession in the

above-captioned cases, hereby move (this "**Motion**") this Court for entry of a final order (the

"**Final Order**"), substantially in the form of **Exhibit A** hereto granting the relief described

below. In support thereof, the Debtors refer to the contemporaneously filed *Declaration of John*

*Brecker in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification
       numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp.
       (3641); New Cotai Ventures, LLC (9385). The Debtors' corporate address is c/o New Cotai, LLC, Two
       Greenwich Plaza, Greenwich, Connecticut 06830.

**Declaration**")[2] and *Declaration of Jay S. Weinberger in Support of DIP Financing* (the

"**Houlihan Declaration**"), attached hereto as **Exhibit B**, and further represent as follows:

### RELIEF REQUESTED

1.        The Debtors respectfully request entry of a Final Order authorizing the Debtors to

execute and enter into a secured debtor-in-possession credit agreement (the "**DIP Agreement**",

together with the other documents entered into in connection therewith, the "**DIP Documents**")[3]

and to obtain secured postpetition financing in the form of a term loan credit facility thereunder

(the "**DIP Facility**").

### JURISDICTION AND VENUE

2.        This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.        The predicates for the relief requested herein are section 364(c) of title 11 of the

United States Code (the "**Bankruptcy Code**"), Rules 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rule 4001-2 of the

Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New

York ("**Local Bankruptcy Rules**").

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day
Declaration.

[3]    Capitalized terms not defined herein have the meaning ascribed to them in the DIP Agreement, a form of which
is annexed hereto as **Exhibit C**.

## BACKGROUND

### I.      The Chapter 11 Cases

4.      On the date hereof (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.      The Debtors continue to operate their businesses and manage their assets as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.      To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

7.      The Debtors constitute a group of affiliated companies that directly or indirectly own interests in Studio City International Holdings Limited ("**Studio City International**"). Studio City International, together with its subsidiaries, owns the Studio City project, an integrated resort comprising entertainment, retail, hotel and gaming facilities located in the Macau Special Administrative Region of the People's Republic of China.

8.      Prior to the Petition Date, the Debtors commenced discussions with an ad hoc group of holders of the Debtors' 10.625% senior pay-in-kind notes due 2019 (the "**Ad Hoc Group**"). The Debtors intend to continue to engage with the Ad Hoc Group in good faith and at arms'-length with the goal of achieving a consensual restructuring in these Chapter 11 Cases.

### II.     The Debtors' Financing Needs

9.      As holding companies, the Debtors do not have significant liquidity needs.  The Debtors prepetition expenditures primarily consisted of payments to third party professionals, such as counsel, accounting and auditing firms, and similar counterparties.  The Debtors expect their postpetition expenditures to primarily consist of fees and expenses accruing to the

3

professionals and other advisors retained by the Debtors with respect to the Debtors'

restructuring and the administration of these Chapter 11 Cases.

10.    The Debtors do not in the ordinary course generate cash with which to satisfy

their obligations.  Instead, the Debtors historically obtained funding through equity infusions

provided by the Debtors' parent companies.  However, as a result of the commencement of these

Chapter 11 Cases, continued equity funding is no longer feasible.

11.    As of the Petition Date, the Debtors held approximately $1.281 million in their

bank accounts.  Such cash is unencumbered and is expected to be sufficient to sustain the

Debtors for the first approximately 30 days of these Chapter 11 Cases.  However, the Debtors do

not have access to liquidity beyond this timeframe.  The Debtors therefore have a need to access

the funding to be made available under the DIP Facility.

**III.    The DIP Facility**

12.    Under the DIP Facility, the Debtors will have access to $6.25 million in term

loans offered by SPCP Group, LLC (the "**Silver Point Lender**").  The DIP Facility will allow

the Debtors to satisfy their cash needs.  As further described below, the DIP Facility provides the

Debtors with access to funds on favorable terms with maximum flexibility. For example, (1) the

annual interest rate is only L+7.00%,[4] (2) there is a lengthy 12 month maturity that, at the

Debtors' option (and upon the satisfaction of certain conditions), could be extended by an

additional 12 months, (3) there is no DIP budget (and accordingly no budgetary event of default),

and (4) there are no DIP milestones.

---

[4]    Pursuant to the terms of the DIP Agreement, the interest rate is L+7.00% per annum for LIBO Rate Loans, and
ABR+6.00% per annum for ABR Loans (each as defined in the DIP Agreement).

4

13.    The Silver Point Lender is an affiliate of Silver Point Capital, L.P. ("**Silver Point**").  Affiliates of investment funds managed Silver Point own a direct or indirect controlling interest in the Debtors.  The Silver Point Lender has agreed to provide the DIP Facility on a super-priority, senior secured basis as follows, subject to the Carve Out (defined below):

(a)    The Silver Point Lender will be granted a first priority security interest in and lien upon all tangible and intangible prepetition and postpetition property and assets of the Debtors and their respective estates, and any proceeds and products thereof, whether existing on the Petition Date or thereafter acquired, excluding avoidance actions under Chapter 5 of the Bankruptcy Code, but including the proceeds of such avoidance actions.

(b)    The obligations of the Debtors under the DIP Agreement and the other DIP Documents (collectively, the "**DIP Obligations**") shall be given superpriority treatment above other administrative expenses of the estate.

14.    Due to the fact that the Debtors have a limited cash runway at the outset of these cases, the Debtors did not solicit financing proposals from other sources prepetition. However, as further described in the Houlihan Declaration submitted concurrently herewith, the DIP Financing terms achieved with the Silver Point Lender are favorable as compared to prevailing market terms for similar debtor-in-possession financing facilities.  Moreover, the Debtors intend to solicit proposals from other parties during the interim period, including members of the Ad Hoc Group.  In the event that the Debtors receive a proposal superior to the Silver Point proposal, the Debtors intend to seek the Bankruptcy Court's approval of such superior proposal.

## CONCISE STATEMENT OF RELIEF REQUESTED

15.    Material provisions of the DIP Agreement are set out at the following sections of

the DIP Agreement and/or the Final Order, pursuant to Bankruptcy Rule 4001(c)(1)(B) and

Local Bankruptcy Rule 4001-2:[5]

| Term | Description |
|------|-------------|
| **Borrower**<br>*DIP Agreement Definitions* | New Cotai, LLC |
| **DIP Lender**<br>*DIP Agreement Definitions* | SPCP Group, LLC |
| **Administrative Agent**<br>*DIP Agreement Definitions* | Silver Point Finance, LLC |
| **Maturity Date**<br>*DIP Agreement § 2.09 and DIP Agreement Definitions; Bankruptcy Rule 4001(c)(1)(B)* | 12 months from the date of entry of the Final Order; however, the Debtors may exercise an option to extend the Maturity Date out for an addition 12 months so long as no default or event of default is ongoing at the time such election is made. |
| **Borrowing Limits**<br>*DIP Agreement § 2.01 and DIP Agreement Definitions; Final Order ¶ 5; Bankruptcy Rule 4001(c)(1)(B)* | $6.25 million |
| **Interest Rate**<br>*DIP Agreement § 2.06; Bankruptcy Rule 4001(c)(1)(B).* | L+7.00% per annum for LIBO Rate Loans, and ABR+6.00% per annum for ABR Loans |

---

[5]    The summary of the DIP Facility is provided for the benefit of the Court and other parties in interest.  To the extent that there are any conflicts between this summary and the DIP Facility or the DIP Documents, the terms of the DIP Documents shall govern.

| Term | Description |
|---|---|
| **Fees and Reimbursement of Expenses** *DIP Agreement §§ 2.10 and 12.01; Local Rule 4001-2(a)(3)* | The Borrower shall pay a commitment fee comprised of 1.00% of the aggregate principal amount commitment with respect to the DIP Facility. The Borrower will reimburse the Administrative Agent in respect of legal fees for one counsel and other expenses incurred by it in connection with the preparation of the DIP Agreement and any related documents, the consummation and administration of the transactions contemplated thereby and the enforcement of the DIP Agreement and any related documents. |
| **Events of Default** *DIP Agreement § 10; Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(11)* | Customary Events of Default, including failure to make payments when due, material inaccuracies of representations and warranties, noncompliance with covenants, impairment of security interests in collateral, invalidity of any Guaranty, judgments in excess of specified amounts, "change of control", dismissal or conversion of the Chapter 11 Cases and certain other bankruptcy matters, in each case, subject to baskets, thresholds, qualifications and customary exceptions and grace periods set forth in the DIP Agreement. |
| **Liens** *DIP Agreement §§ 2.08 and 11; Final Order ¶¶ 8, 9, 11; Bankruptcy Rule 4001(c)(1)(B)* | The Borrower will enter into Security Documents granting the Administrative Agent, for the benefit of the DIP Lender, security in respect of its obligations under the DIP Agreement, subject to the Carve-Out. The liens and security interests granted under the Security Documents shall have the status afforded by sections 364(c)(1), (2) and (3) of the Bankruptcy Code. The liens are deemed valid and perfected at the time and on the date of entry of the Final Order. The liens shall have priority over any liens or security interests granted pursuant to any interim or final orders of the Court. |
| **Superpriority Claims** *Final Order ¶ 7; Bankruptcy Rule 4001(c)(1)(B)(i)* | Pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out, the obligations of the Borrower under the DIP Agreement shall constitute obligations of the Borrower with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code. |
| **Carve-Out** *DIP Agreement § 2.08; Final Order ¶ 12; Bankruptcy Rule 4001(b)(1)(B)(iii); Local Bankruptcy Rule 4001-2(a)(5)* | The liens and claims of or granted to the Administrative Agent and the DIP Lender in the Final Order and the DIP Documents will be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "**Carve-Out**"): <br><br> (a) the claims of the respective retained professionals of the Debtors and any statutory committee appointed in the Chapter 11 Cases (collectively, the "**Retained Professionals**") for fees and expenses incurred at any time on and after the Petition |

| Term | Description |
|------|-------------|
|  | Date and prior to the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Debtors that the DIP Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code;<br><br>(b)  (i) the claims of the Retained Professionals for fees and expenses which were incurred on and after the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Debtors that the DIP Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code and do not exceed $1,000,000 in the aggregate plus (ii) the fees and expenses incurred by any professionals engaged by any successor to the Debtors, including, without limitation, any trustee appointed under Chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $250,000; and<br><br>(c)  the unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code;<br><br>provided that, except as otherwise provided in the Final Order, no portion of the Carve-Out shall be utilized for the payment of professional fees and expenses incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the Indebtedness (as defined in the DIP Agreement) of the Debtors owing to the DIP Lender or indemnified parties under the DIP Facility or to the collateral securing the DIP Facility; provided further that so long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as long as the same may be due and payable, and the same shall not reduce the Carve-Out; provided, however, that the foregoing shall not be construed as authorization to the allowance of any fees and expenses referenced herein and shall not affect the right of any parties to object to the allowance and payment of such amounts. |

| Term | Description |
|---|---|
| **Conditions**<br>*DIP Agreement §§ 5,6; Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(2)* | Conditions to Initial Borrowing Date:<br><br>(a)    The DIP Agreement becomes effective and, if requested by the DIP Lender, delivery to DIP Lender of Note;<br><br>(b)    Entry of Final Order by the Court;<br><br>(c)    Validity of Liens of the DIP Lender;<br><br>(d)    Compliance with Margin Regulations;<br><br>(e)    No conflict with or default under any material agreement or contractual or other restriction, except as permitted by DIP Order;<br><br>(f)    No Material Adverse Effect since the Petition Date; and<br><br>(g)    Payment of fees to Administrative Agent<br><br>Conditions to Subsequent Borrowing:<br><br>(a)    Absences of a Default or Event of Default and material accuracy of representations and warranties;<br><br>(b)    Notice of Borrowing received by the Administrative Agent;<br><br>(c)    Final Order shall be in full force and effect and shall not have been vacated, reversed or stayed, or modified or amended in any material respect;<br><br>(d)    Borrower shall have paid all costs, fees, expenses and other compensation to the Administrative Agent pursuant to DIP Agreement to the extent then due and invoiced at least three Business Days prior;<br><br>(e)    Requested Loans, together with other Loans outstanding, shall not exceed the amount authorized by the Final Order; and<br><br>(f)    No Material Adverse Effect since the Petition Date |
| **Waiver of the Automatic Stay**<br>*DIP Agreement § 10; Final Order ¶ 10(a); Bankruptcy Rule 4001(c)(1)(B)(iv); Local Bankruptcy Rule 4001-2(a)(10)* | Modified to permit the Administrative Agent and DIP Lender to exercise, upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents. |

| Term | Description |
|---|---|
| **Indemnification**<br>*DIP Agreement*<br>*§ 12.01;*<br>*Final Order ¶ 20;*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ix)* | The Borrower to fully indemnify the Administrative Agent and the DIP Lender and its related parties against all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of any investigation, litigation or other proceeding related to the entering into and/or performance of DIP Documents or the proceeds of any Loans thereunder or the consummation of any transactions contemplated in the DIP Documents or the exercise of any of their rights or remedies provided in the DIP Documents. |

## APPLICABLE AUTHORITY

### I.    Entering Into the DIP Agreement Is Necessary

16.    As noted above, the Debtors do not in the ordinary course generate cash with which to satisfy their obligations. Additionally, the commencement of these Chapter 11 Cases has made the Debtors' historical means of obtaining funding—through equity contributions—impossible to continue. Approval of the DIP Agreement and the modest funding provided thereunder will therefore provide the Debtors with critical access to cash they will need during the course of these Chapter 11 Cases without prejudice to any other party.

17.    Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. §

364(c). The Debtors propose to obtain the financing set forth in the DIP Agreement by providing superpriority claims and senior secured liens pursuant to sections 364(c) of the Bankruptcy Code.

18.     Specifically, subject to the Carve-Out, the DIP Facility shall be secured by a senior lien on property of the estate. Additionally, subject to the Carve-Out, the obligations of the Debtors under the DIP Agreement shall constitute obligations of the Debtors with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code.

19.     The Debtors, with the assistance of their investment bankers at Houlihan Lokey Capital Inc. ("**Houlihan**"), determined that soliciting a DIP proposal from the Silver Point Lender was the Debtors' best option for ensuring that the Debtors would be able to finance these Chapter 11 Cases.  Thus, the Debtors negotiated with Silver Point, in good faith, to procure a modest $6.25 million secured credit facility to fund the Debtors' restructuring expenses during the Chapter 11 Cases. As further described in the Houlihan Declaration, the terms of the DIP Facility are significantly more favorable to the Debtors than prevailing market terms.

20.     Specifically, Silver Point's proposal (1) included no milestones, (2) provided a lengthy 12 month maturity that, at the Debtors' option (and upon the satisfaction of certain conditions), could be extended by an additional 12 months, (3) did not subject the Debtors' use of the DIP Financing to compliance with any budget, (4) included a market interest rate of L+7.00%,[6] and (5) included minimal fees (a 1.00% commitment fee) and other charges to the Debtors' estates.

---

[6]     Pursuant to the terms of the DIP Agreement, the interest rate is L+7.00% per annum for LIBO Rate Loans, and ABR+6.00% per annum for ABR Loans (each as defined in the DIP Agreement).

21.     Importantly, the DIP Facility merely serves as a floor against which potential

superior DIP proposals may be submitted.  Indeed, the Debtors with the assistance of Houlihan

intend to solicit DIP proposals from potential third party lenders, including members of the Ad

Hoc Group, following the Petition Date and prior to the hearing on the Motion. If the Debtors are

able to procure financing on terms superior to the DIP Facility, the Debtors may determine to

replace the DIP Facility without penalty.

22.     Provided that a debtor's judgment in choosing its postpetition financing does not

violate the provisions of, and policies underlying the Bankruptcy Code, courts grant a debtor

considerable deference. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr.

S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to

be utilized on grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit a party in interest").

23.     Here, the DIP Facility is modest in size, provides critical funds necessary to

support these Chapter 11 cases, is on significantly below market terms, and may be replaced

without penalty if a superior DIP is obtained.  The terms of the DIP Agreement and the Final

Order related thereto are fair and reasonable, were negotiated in good faith by the Debtors and

the Silver Point Lender, and reflect the Debtors' reasonable exercise of business judgment

consistent with their fiduciary duties. Accordingly, the relief is warranted under the

circumstances.

### REQUEST FOR FINAL HEARING

24.     Notice of this Motion will be given to: (a) counsel to the Silver Point Lender, (b)

the U.S. Trustee, (c) counsel to the Ad Hoc Group, (d) counsel to the Debtors' equity holders, (e)

the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the parties

included on the Debtors' consolidated list of their 20 largest unsecured creditors, (h) the United

States Attorney of the Southern District of New York, and (i) all parties entitled to notice

pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy

Court for the Southern District of New York. The Debtors submit that no other or further notice

is required.

## NO PRIOR REQUEST

25.     No prior request for the relief requested herein has been made to this Court or any

other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated:  New York, New York
        May 1, 2019

                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                            */s/ Jay M. Goffman*
                            Jay M. Goffman
                            Mark A. McDermott
                            Evan A. Hill
                            Four Times Square
                            New York, New York 10036-6522
                            Telephone: (212) 735-3000
                            Fax: (212) 735-2000

                            *Proposed Counsel to Debtors*
                            *and Debtors-in-Possession*

**EXHIBIT A**

**Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **NEW COTAI HOLDINGS, LLC**, *et al.*, | **Case No. 19-22911 (___)** |
| **Debtors.** [1] | **(Jointly Administered)** |

### FINAL ORDER AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364(c) OF THE BANKRUPTCY CODE

Upon the Motion[2] of the Debtors for entry of a final order pursuant to section 364(c) of the Bankruptcy Code, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") seeking, among other things:

(1)     that a hearing (the "**Hearing**") on the Motion be held before this Court to consider entry of this order (the "**Order**") and granting of all of the relief requested in the Motion on a final basis; authority, pursuant to this Order, to execute and enter into the secured debtor-in-possession credit agreement (the "**DIP Agreement**," the DIP Agreement, together with the other documents entered into in connection therewith, the "**DIP Documents**") and to obtain superpriority secured postpetition financing (the "**DIP Facility**") on the terms and conditions set forth in the DIP Agreement;

(2)     authority, pursuant to this Order, to immediately obtain term loans under the DIP Facility up to a maximum aggregate principal amount outstanding of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp. (3641); New Cotai Ventures, LLC (9385). The Debtors' corporate address is c/o New Cotai, LLC, Two Greenwich Plaza, Greenwich, Connecticut 06830.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

$6,250,000 to pay postpetition operating expenses of and restructuring costs of the

Debtors in accordance with the terms and conditions set forth in the DIP Agreement; and

it appearing that the relief requested in the Motion is necessary to provide the Debtors with

sufficient capital to continue operations, to preserve the going concern value of their businesses

and to continue their restructuring efforts; and it further appearing that notice of the Motion was

provided in the form and manner set forth in the Motion; and it also appearing that notice of the

Hearing and copies of the proposed form of order approving the Motion and a draft of the DIP

Agreement were filed and served on the Notice Parties, and any other party that filed a request

for notices with this Court; and such notice constituting good and sufficient notice of the Hearing

under the circumstances in accordance with Bankruptcy Rules 4001(c) and 4001(d), section

102(1) of the Bankruptcy Code, and Local Bankruptcy Rule 4001-2, as required by section

364(c) of the Bankruptcy Code in light of the nature of the relief requested in the Motion; and for

good cause shown;

Upon the record made by the Debtors at the Hearing and after due deliberation

and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1.    *Jurisdiction*.  This Court has jurisdiction over the Debtors' chapter 11 cases (the

"**Chapter 11 Cases**"), the Motion, and the parties and property affected hereby pursuant to

28 U.S.C. §§ l57(b) and 1334.  Consideration of the Motion constitutes a core proceeding as

defined in 28 U.S.C. § l57(b)(2).  The statutory predicates for the relief granted herein are section

364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Bankruptcy Rule

4001-2.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion and the Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001 (c) and (d) and Local Bankruptcy Rule 4001-2, and no other notice is required or need be given.

3.      *Findings Regarding the Financing*.

(a)      Based upon the record presented to the court by the Debtors, it appears that the ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents is vital to the Debtors, their estates and creditors.  The liquidity to be provided under the DIP Documents will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of their businesses while also pursuing a restructuring pursuant to these Chapter 11 Cases.  Therefore, good and sufficient cause has been shown for the entry of this Order.

(b)      The Debtors have an immediate need to obtain financing under the DIP Agreement in order to permit, among other things, the orderly continuation of the operation of their businesses, to pay the fees and expenses of their restructuring and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the incurrence of additional indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors and to complete their restructuring efforts. Good cause therefore exists for this Order to be effective immediately upon entry and to waive any stay that would otherwise be imposed thereon, including pursuant to Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure.

(c)     The terms of the DIP Agreement appear to be fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(d)     The DIP Agreement has been negotiated in good faith between the Debtors, Silver Point Finance, LLC, as Administrative Agent under the DIP Agreement (the "**DIP Agent**"), and SPCP Group, LLC, as a Lender under the DIP Agreement (together with the other Lender parties thereto from time to time, the "**DIP Lenders**" and the DIP Lenders and DIP Agent, collectively, the "**DIP Secured Parties**")), and all of the  Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Documents, shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(e)     Absent granting the relief sought by this Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Documents is therefore in the best interest of the Debtors' estates.

4.     *Withdrawal/Denial of Objections; Approval of the Motion*.  Except to the extent related to final approval of the DIP Documents, any objections and reservations of rights contained therein that have not been withdrawn and/or settled as set forth on the record of the Hearing are hereby overruled.  The Motion is granted in all respects on a final basis.

5.      *Authorization of the DIP Agreement.*

(a)     The DIP Agreement is approved in all respects.  The Debtors are hereby authorized to enter into and execute the DIP Documents.  The Debtors are hereby authorized to immediately borrow money pursuant to and subject to the terms of the DIP Agreement up to a maximum aggregate principal amount of $6,250,000 (in accordance with the terms of the DIP Agreement), subject to any limitations of borrowings under the DIP Documents, and in accordance with the terms of this Order and the DIP Documents, which shall be used solely in accordance with the terms of the DIP Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is expressly authorized and directed on a final basis to perform all acts, to make, execute and deliver all instruments and documents, to perform all obligations thereunder and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Agreement, including, without limitation:

(i)     the negotiation, execution, delivery and performance of the DIP Documents, and

(ii)     the performance of all other acts required under or in connection with the DIP Agreement.

6.      Upon execution and delivery of the DIP Documents and the entry of this Order, each of the DIP Documents shall constitute a valid and binding obligation of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of such DIP Document.  The DIP Obligations of the Debtors shall be joint and several.  In accordance with the terms of the DIP Agreement, if one Debtor's liability under the DIP Facility is ultimately for

5

the benefit of another Debtor, the Debtor undertaking such liability shall have an intercompany

claim against such benefitting Debtor.

7.    *Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, the

obligations of the  Debtors under the DIP Agreement and the other DIP Documents (collectively,

the "**DIP Obligations**") shall constitute obligations of the Debtors with priority over any and all

administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy

Code, and over any and all administrative expenses or other claims under sections 105, 326, 328,

330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code (the "**Superpriority Claims**"); provided

that all Superpriority Claims shall be subject to the Carve-Out (as defined below).  The

Superpriority Claims shall be payable from all property of each Debtor's estate except avoidance

actions under Chapter 5 of the Bankruptcy Code,  but from the proceeds of such avoidance

actions.

8.    *DIP Liens*.  As security for the  Debtors' DIP Obligations as provided for under

the DIP Documents, effective and perfected upon the date of the Order and without the necessity

of the execution by the  Debtors of mortgages, security agreements, pledge agreements,

financing statements or other similar documents, the DIP Secured Parties are hereby granted the

following security interests and liens, subject in each case to the Carve-Out (all property

identified in clauses (a) and (b) below being collectively referred to as the "**Collateral**"; and all

such liens and security interests granted to the DIP Secured Parties pursuant to this Order and the

DIP Documents, the "**DIP Liens**"):

(a)    First Lien on Unencumbered Property.  A valid, binding, continuing,

enforceable, fully-perfected first priority security interest in and lien upon all tangible and

intangible prepetition and postpetition property and assets of the Debtors and their respective

6

estates wherever located, and any proceeds and products thereof, whether existing on the date of

filing of the Debtors' chapter 11 petitions (the "**Petition Date**") or thereafter acquired, that is not

subject to valid, perfected, non-avoidable and enforceable liens in existence immediately prior to

the Petition Date; provided, however, the Collateral shall not include avoidance actions under

Chapter 5 of the Bankruptcy Code, but shall include the proceeds thereof.

(b)      Liens Junior to Existing Liens.  A valid, binding, continuing, enforceable,

fully-perfected junior security interest in and lien upon all tangible and intangible prepetition and

postpetition property and assets of the Debtors and their respective estates wherever located, and

any proceeds and products thereof, whether now existing or hereafter acquired, that is subject to

valid, perfected and unavoidable liens (if any) in existence immediately prior to the Petition Date

or to valid and unavoidable liens in existence immediately prior to the Petition Date but

perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (collectively, the

"**Existing Liens**").

9.      *DIP Lien Priority.* The DIP Liens shall be senior to any liens granted by any

Debtor on or after the Petition Date (including, without limitation, any liens granted pursuant to

an order of this Court) and the Debtors shall not seek to prime the DIP Liens except in

connection with replacement financing that repays in full in cash all DIP Obligations.

10.      *Protection of DIP Lender's Rights.*

(a)      The automatic stay provisions of section 362 of the Bankruptcy Code are

vacated and modified to permit the DIP Secured Parties to exercise, during the continuance of an

Event of Default, all rights and remedies under the DIP Documents provided, that,

notwithstanding anything to the contrary contained herein or in the DIP Documents, no less than

seven days written notice shall first be provided to counsel to the Debtors, counsel to any

7

statutory creditors' committee appointed in these Chapter 11 Cases and the United States Trustee prior to the exercise of any such right.

(b)     In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties set forth in this Order or the DIP Documents.

11.     *Perfection of DIP Liens*.  The DIP Secured Parties are hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.  Whether the DIP Lender shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid and perfected at the time and on the date of entry of this Order.  The Debtors shall, if requested, execute and deliver to the DIP Secured Parties all such agreements, financing statements, instruments and other documents as the DIP Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens.  A certified copy of this Order may, in the discretion of the DIP Secured Parties, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Order for filing and recording.

8

12.    *Carve-Out*.  Notwithstanding anything to the contrary contained in this Order or other order of this Court, the liens and claims of or granted to the DIP Secured Parties in this Order and/or the DIP Documents shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "**Carve-Out**"):

(a)    the claims of the respective retained professionals of the Debtors and any statutory committee appointed in the Chapter 11 Cases (collectively, the "**Retained Professionals**") for fees and expenses incurred at any time on and after the Petition Date and prior to the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Debtors that the DIP Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code;

(b)    (i) the claims of the Retained Professionals for fees and expenses which were incurred on and after the occurrence of an Event of Default and delivery of a notice from the DIP Lender to the Debtors that the DIP Lender desires to trigger the Carve-Out; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 327, 328, 330, 331 or 363 of the Bankruptcy Code and do not exceed $1,000,000 in the aggregate plus (ii) the fees and expenses incurred by any professionals engaged by any successor to the Debtors, including, without limitation, any trustee appointed under Chapter 11 or 7 of the Bankruptcy Code or any examiner with expanded powers, in an aggregate amount not to exceed $250,000; and

(c)    the unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code;

provided that, except as otherwise provided herein or in the Order, no portion of the Carve-Out

shall be utilized for the payment of professional fees and expenses incurred in connection with

any challenge to the amount, extent, priority, validity, perfection or enforcement of the

Indebtedness (as defined in the DIP Agreement) of the Debtors owing to the DIP Lender or

indemnified parties under the DIP Facility or to the collateral securing the DIP Facility; provided

further that so long as no Event of Default shall have occurred and be continuing, the Debtors

shall be permitted to pay compensation and reimbursement of expenses allowed and payable

under sections 330 and 331 of the Bankruptcy Code, as long as the same may be due and

payable, and the same shall not reduce the Carve-Out; provided, however, that the foregoing

shall not be construed as authorization to the allowance of any fees and expenses referenced

herein and shall not affect the right of any parties to object to the allowance and payment of such

amounts.

13.    *Events of Default*.  Except as otherwise provided herein, or to the extent the

Lender may otherwise agree in writing, (i) any violation of any of the terms of this Order, or (ii)

any occurrence of an "Event of Default" under the DIP Agreement or the DIP Documents, as

applicable, shall be deemed to be an Event of Default under this Order.

14.    *Order Governs*.  In the event of any conflict between the provisions of the DIP

Documents and this Order, the provisions of this Order shall govern.

15.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions

of this Order, including, without limitation, all findings herein, shall be binding upon all parties

in interest in these Chapter 11 Cases, including, without limitation, any creditors' committee

appointed in these Chapter 11 Cases, any other committee appointed in these Chapter 11 Cases

and the Debtors and their respective successors and assigns (including any chapter 7 or chapter

10

11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to

the benefit of the DIP Secured Parties and the Debtors and their respective successors and

assigns; *provided*, *however*, that the DIP Lender shall have no obligation to extend any financing

to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  If

an order dismissing or converting any of these cases under sections 305 or 1112 of the

Bankruptcy Code or otherwise or an order appointing a chapter 11 trustee or an examiner with

expanded powers is at any time entered, and unless otherwise agreed to by the DIP Secured

Parties, such order shall provide that (i) the DIP Liens, and Superpriority Claim granted

hereunder and in the DIP Documents shall continue in full force and effect, remain binding on all

parties-in-interest, and maintain their priorities as provided in this Order until all DIP Obligations

are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP

Documents are terminated in accordance with their terms, (ii) this Court shall retain jurisdiction,

notwithstanding such dismissal, for purposes of enforcing the DIP Liens and the Superpriority

Claim, and (iii) all postpetition indebtedness, obligation or liability incurred by the Debtors to the

DIP Secured Parties prior to the date of such order, including without limitation, the DIP

Obligations, shall be governed in all respects by the original provisions of this Order, and the

DIP Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted

herein and in the DIP Documents with respect to all such indebtedness, obligations or liability.

16.    *No Marshalling*.  The DIP Secured Parties shall not be subject in any way

whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the

Collateral.

17.    *Rights Under Section 363(k)*.  The full amount of the DIP Obligations may be

used by the DIP Secured Parties to "credit bid" for the assets and property of the Debtors as

provided for in section 363(k) of the Bankruptcy Code without the need for further Court order

authorizing the same. Nothing in this Order or the DIP Credit Documents or any of the DIP

Secured Parties status as such shall in any way hinder or prevent any DIP Secured Party from

serving as a "stalking horse" bidder in any sale process in the chapter 11 cases.

18.      *Restriction on Use of DIP Funds.*  Notwithstanding anything herein to the

contrary, no Collateral, proceeds thereof, proceeds of the DIP Financing, or any portion of the

Carve-Out may be used by any of the Debtors, their estates, any official or unofficial committee,

any trustee or examiner appointed in these chapter 11 cases or any chapter 7 trustee, or any other

person, party or entity to, directly or indirectly to assert, join, commence, support, investigate, or

prosecute any action for any claim, counter-claim, action, cause of action, proceeding,

application, motion, objection, defense, or other contested matter seeking any order, judgment,

determination, or similar relief against, or adverse to the interests of, DIP Secured Parties and

their affiliates (in any capacity), with respect to any transaction, occurrence, omission, or action,

including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-called

"lender liability" claims and causes of action; (iii) any action with respect to the validity and

extent of the DIP Obligations, the Superpriority Claims, or the validity, extent, perfection, and

priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off,

offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against,

disallow, impair, raise any defenses, cross-claims, or counter claims or raise any other challenges

under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against

or with respect to the DIP Liens or the Superpriority Claims in whole or in part; (v) appeal or

otherwise challenge this Order, the DIP Documents, or any of the transactions contemplated herein

or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether

directly or indirectly) the DIP Secured Parties in respect of their liens and security interests in the Collateral or any of their rights, powers, or benefits hereunder or in the DIP Documents.

19.    *No Third Party Rights*.  Except as explicitly provided herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

20.    *No Deemed Control*.  In making decisions to advance any extensions of credit under the DIP Facility, or in taking any other actions related to this Order or the DIP Documents, the DIP Secured Parties shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtors and the DIP Secured Parties' relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind. Further, the Debtors are authorized and directed to indemnify the DIP Secured Parties against any liability arising in connection with the DIP Agreement or the DIP Documents to the extent set forth in the DIP Agreements and the DIP Documents.

21.    This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

Dated: [●], New York
       [●], 2019

_____
UNITED STATES BANKRUPTCY JUDGE

13

**EXHIBIT B**

**Houlihan Declaration**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Evan A. Hill
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Proposed Counsel to Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **NEW COTAI HOLDINGS, LLC, *et al.*,** | **Case No. 19--22911 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**DECLARATION OF JAY S. WEINBERGER IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER**
**AUTHORIZING THE DEBTORS TO OBTAIN**
**POSTPETITION FINANCING**

I, Jay S. Weinberger, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty

of perjury:

1.      I am a Managing Director in the Financial Restructuring Group of Houlihan

Lokey Capital, Inc. ("**Houlihan**") and am duly authorized to make this Declaration on behalf of

Houlihan. Houlihan is the proposed investment banker to New Cotai Holdings, LLC, and certain

of its affiliates (collectively, the "**Debtors**," the "**Company**," or "**New Cotai**"), the debtors and

debtors-in-possession in the above-captioned cases.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification
numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp.
(3641); New Cotai Ventures, LLC (9385). The Debtors' corporate address is c/o New Cotai, LLC, Two
Greenwich Plaza, Greenwich, Connecticut 06830.

2.        Houlihan Lokey is a financial advisory services firm with its principal office located at 10250 Constellation Boulevard, Los Angeles, California 90067. I have been employed by Houlihan Lokey for the past 12 years. Since joining Houlihan Lokey, I have provided restructuring advice within the context of chapter 11 restructurings, out-of-court restructurings, and distressed transactions. I am a graduate of the University of Florida and have an MBA in finance and accounting from New York University's Stern School of Business.

3.        My recent engagements include Country Fresh Inc., Tintri Inc., VICI Properties Inc., Synchronoss Technologies, Caesars Entertainment, iPayment Holdings, Aliante Casino, My Alarm Center, Natural Resource Partners, Florida Gaming Corp., Trump Entertainment Resorts, Delphi Automotive, CEVA Logistics, CIT Group Inc., Rivers Casino, Riviera Holdings Corp., Majestic Star Casino, Centaur Gaming, and Indianapolis Downs, LLC.

4.        I submit this declaration in support of *Debtors' Motion for Entry of a Final Order Under 11 U.S.C. § 364, Bankruptcy Rules 4001 and 9014, and Local Bankruptcy Rule 4001-2 Authorizing the Debtors to Obtain Postpetition Financing* (the "**DIP Motion**").[2]

5.        All facts set forth in this declaration are based on (i) my personal knowledge, (ii) my discussions with the Debtors' representatives, other members of the Houlihan team, or other interested parties, (iii) my review of relevant documents, or (iv) my opinion based upon my experience, knowledge, and information concerning the Debtors' financial affairs. If I were called to testify, I would testify competently to the facts set forth herein.

---

[2]    Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the DIP Motion.

I.      **The Debtors' Financing Needs**

6.      As holding companies, the Debtors do not have significant liquidity needs.  The
Debtors prepetition expenditures primarily consisted of payments to third party professionals,
such as counsel, accounting and auditing firms, and similar counterparties. The Debtors expect
their postpetition expenditures to primarily consist of fees and expenses accruing to the
professionals and other advisors retained by the Debtors with respect to the Debtors'
restructuring and the administration of these Chapter 11 Cases.

7.      The Debtors do not in the ordinary course generate cash with which to satisfy
their obligations.  Instead, the Debtors historically obtained funding through equity infusions
provided by the Debtors' parent companies. However, as a result of the commencement of these
Chapter 11 Cases, continued equity funding is no longer feasible.

8.      As of the Petition Date, the Debtors held approximately $1.35 million in their
bank accounts.  Such cash is unencumbered and is expected to be sufficient to sustain the
Debtors for the first approximately 30 days of these Chapter 11 Cases.  However, the Debtors do
not have access to liquidity beyond this timeframe.  The Debtors therefore have a need to access
the funding to be made available under the DIP Facility.

II.     **The Proposed DIP Financing**

9.      Prior to the Petition Date, the Debtors commenced discussions with an ad hoc
group (the "**Ad Hoc Group**") of holders of the Debtors' 10.625% Senior Pay-In-Kind Notes due
May 2019 (the "**Notes**") that collectively hold more than a majority of the aggregate principal
amount of the Notes.

10.     Once the Debtors determined that they were unlikely to reach a deal with the Ad
Hoc Group in time to avoid a maturity default under the Notes, the Debtors quickly began to
prepare for an in-court process. The Debtors, with the assistance of Houlihan, determined that

3

soliciting a DIP proposal from affiliates of Silver Point was the Debtors' best option for ensuring

that the Debtors would be able to finance these Chapter 11 Cases.  Thus, the Debtors negotiated

with Silver Point, in good faith, to procure a modest $6.25 million secured credit facility (the

"**DIP Financing**") to fund the Debtors' restructuring expenses during the Chapter 11 Cases.

11.     Silver Point's final proposal included the following terms: (1) aggregate financing

up to $6.25 million, (2) no milestones, (3) 12 month maturity that, at the Debtors' option (and

upon the satisfaction of certain conditions), could be extended by an additional 12 months, (4) no

budgetary compliance covenants, (5) interest rate of LIBOR plus 7.00% and (6) minimal fees (a

1.00% commitment fee) or other charges to the Debtors' estates.  The DIP Financing would be

secured by substantially all of the Debtors' assets and subject to other customary protections

made available to debtor-in-possession lenders.

**III.     The Proposed DIP Financing Is Reasonable and Permits Superior Proposals**

12.     Due to the speed with which the Debtors were required to prepare for these

Chapter 11 Cases—and the fact that the Debtors do have a limited cash runway—the Debtors did

not solicit financing proposals from other sources prepetition. However, I believe that the DIP

Financing terms achieved with Silver Point are favorable as compared to prevailing market terms

for similar debtor-in-possession financing facilities.  Specifically, in my experience, the lack of

milestones, lengthy and flexible maturity, lack of budget requirements, proposed interest rate,

and minimal fees and other charges render the Silver Point proposal competitive and in many

cases better than market terms for similar debtor-in-possession financing facilities. In my

opinion, the proposed DIP Financing from Silver Point is more favorable than customary market

terms and is reasonable under the circumstances.

13.     Moreover, the Debtors, with the assistance of Houlihan, intend to solicit proposals

from other parties during the interim period, including members of the Ad Hoc Group.  In the

4

event that the Debtors receive a proposal superior to the Silver Point proposal, I understand that

the Debtors will seek the Bankruptcy Court's approval of such superior proposal.  I further

understand that the Debtors intend to supplement the record prior to the hearing to consider the

DIP Motion based on the results of the postpetition marking process.

Dated: May 1, 2019
      New York, New York

                                         */s/ Jay S. Weinberger*
                                         Jay S. Weinberger

**EXHIBIT C**

**Form of DIP Agreement**

$6,250,000

**SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

among

**NEW COTAI, LLC,**
**as the Borrower,**

**The Guarantors party hereto,**

**The Lenders party hereto,**

and

**SILVER POINT FINANCE, LLC,**

**as the Administrative Agent**

**Dated as of May 1, 2019**

# TABLE OF CONTENTS

Page

SECTION 1. Definitions and Accounting Terms .................................................................2

    1.01    Defined Terms ....................................................................................................2

SECTION 2. Amount and Terms of DIP Facility; Lien Priority .......................................9

    2.01    The Commitments.................................................................................9
    2.02    Minimum Amount of Each Borrowing...................................................10
    2.03    Notice of Borrowing .........................................................................10
    2.04    Disbursement of Funds .....................................................................10
    2.05    Notes ..................................................................................................10
    2.06    Interest...............................................................................................11
    2.07    No Discharge; Survival of Claims .....................................................11
    2.08    Priority and Liens...............................................................................12
    2.09    Extension of Maturity Date.................................................................13
    2.10    Fees. ...................................................................................................14

SECTION 3. [Reserved] ...................................................................................................14

SECTION 4. Prepayments; Payments; Taxes; Application of Proceeds ......................14

    4.01    Voluntary Prepayments......................................................................14
    4.02    Mandatory Prepayments. ...................................................................14
    4.03    Method and Place of Payment ...........................................................14
    4.04    Net Payments; Taxes..........................................................................14
    4.05    Application of Proceeds .....................................................................16
    4.06    Breakage Costs...................................................................................16

SECTION 5. Conditions Precedent to the Initial Borrowing Date ...............................16

    5.01    Effective Date; Notes .........................................................................16
    5.02    Validity of Liens ................................................................................17
    5.03    Margin Regulations............................................................................17
    5.04    No Conflicts .......................................................................................17
    5.05    Material Adverse Change ...................................................................17
    5.06    Fees ....................................................................................................17

SECTION 6. Conditions Precedent to All Credit Events ..............................................17

    6.01    No Default; Representations and Warranties......................................17
    6.02    Notice of Borrowing ..........................................................................17
    6.03    Final Orders .......................................................................................18
    6.04    Expense Reimbursement, etc. ............................................................18
    6.05    Outstanding Loans .............................................................................18

6.06    Material Adverse Change ........................................................................18

SECTION 7. Representations, Warranties and Agreements .........................................18

7.01    Corporate/Limited Liability Company/Limited Partnership Status.....................18
7.02    Corporate Power and Authority ...............................................................19
7.03    No Violation........................................................................................19
7.04    Governmental Approvals .......................................................................19
7.05    Material Adverse Change ......................................................................20
7.06    Litigation............................................................................................20
7.07    Use of Proceeds; Margin Regulations.......................................................20
7.08    Tax Returns and Payments......................................................................20
7.09    The Security Documents ........................................................................21
7.10    Compliance with Statutes, etc. ...............................................................21
7.11    Insurance. ..........................................................................................21
7.12    [Reserved]...........................................................................................21
7.13    Final Order ........................................................................................21
7.14    Appointment of Trustee or Examiner; Liquidation ......................................21
7.15    Perfection of Security Interest ...............................................................22
7.16    Liens..................................................................................................22

SECTION 8. Affirmative Covenants ..........................................................................22

8.01    Maintenance of Property; Insurance. .......................................................22
8.02    Compliance with Statutes, etc. ...............................................................22
8.03    Use of Proceeds. ..................................................................................22
8.04    Performance of Post-Petition Obligations .................................................22
8.05    Payment of Taxes.................................................................................22

SECTION 9. Negative Covenants .............................................................................23

9.01    Liens..................................................................................................23
9.02    Consolidation, Merger, Purchase or Sale of Assets, etc. ..............................23
9.03    Indebtedness........................................................................................23
9.04    Advances, Investments and Loans ...........................................................23
9.05    Transactions with Affiliates ...................................................................23
9.06    Pre-Petition Payments ...........................................................................24
9.07    Final Bankruptcy Court Order; Administrative Priority; Lien
        Priority; Payment of Claims....................................................................24
9.08    Restrictions on Activities. ......................................................................24

SECTION 10. Events of Default ................................................................................25

10.01   Payments ............................................................................................25
10.02   Representations, etc. .............................................................................25
10.03   Covenants............................................................................................25
10.04   Security Documents ..............................................................................25
10.05   Guarantees...........................................................................................25

10.06    Judgments ....................................................................................................25
10.07    Change of Control ........................................................................................25
10.08    Dismissal or Conversion of Chapter 11 Case ............................................26
10.09    Relief from Automatic Stay .........................................................................26
10.10    Final Order ...................................................................................................26
10.11    Pre-Petition Payments .................................................................................26
10.12    Invalid Plan .................................................................................................26
10.13    Disgorgement ...............................................................................................26
10.14    Sale of Assets ...............................................................................................26
10.15    Right to File Chapter 11 Plan .....................................................................27
10.16    Entry of Order .............................................................................................27

SECTION 11.   Security Agreement; Grant of Liens ...............................................27

SECTION 12.   Miscellaneous ....................................................................................28

12.01    Payment of Expenses, etc. ...........................................................................28
12.02    Right of Setoff .............................................................................................28
12.03    Notices ..........................................................................................................29
12.04    Benefit of Agreement ...................................................................................29
12.05    No Waiver; Remedies Cumulative ...............................................................30
12.06    Calculations; Computations ........................................................................30
12.07    **GOVERNING LAW; SUBMISSION TO JURISDICTION;
         VENUE;  WAIVER OF JURY TRIAL** ...................................................30
12.08    Counterparts ................................................................................................32
12.09    Effectiveness ................................................................................................32
12.10    Headings Descriptive ...................................................................................32
12.11    Amendment or Waiver; etc. .........................................................................32
12.12    Survival ........................................................................................................33
12.13    Confidentiality .............................................................................................33
12.14    Register .........................................................................................................33
12.15    Judgment Currency ......................................................................................33
12.16    Language .......................................................................................................34
12.17    Waiver of Immunity .....................................................................................34
12.18    Order .............................................................................................................34
12.19    Parties Including Trustees; Bankruptcy Court Proceedings ......................34

SECTION 13.   Guaranty ............................................................................................35

13.01    Guaranty .......................................................................................................35
13.02    Nature of Liability .......................................................................................35
13.03    Independent Obligation ...............................................................................36
13.04    Authorization ...............................................................................................36
13.05    Continuing Guaranty and Reliance .............................................................38
13.06    Subordination ..............................................................................................38
13.07    Payments ......................................................................................................38
13.08    Reinstatement ..............................................................................................38

13.09    Contribution ..................................................................................................39
13.10    Limitation on Obligations .............................................................................40

SECTION 14. The Administrative Agent.......................................................................40

14.01    Actions ..........................................................................................................40
14.02    Exculpation. ..................................................................................................41
14.03    Successor........................................................................................................43
14.04    Loans by the Administrative Agent. ..............................................................44
14.05    Credit Decisions.............................................................................................44
14.06    Copies, etc. ....................................................................................................44
14.07    Reliance by Administrative Agent..................................................................44
14.08    Defaults..........................................................................................................45
14.09    Posting of Approved Electronic Communications. ........................................45

Schedules:
SCHEDULE I                     Commitments


Exhibits:

EXHIBITS A                     Final Order

THIS SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of May 1, 2019, among NEW COTAI, LLC, a Delaware limited liability company, as the borrower (the "Borrower"), NEW COTAI HOLDINGS, LLC, a Delaware limited liability company, as a guarantor ("Holdings"), NEW COTAI VENTURES, LLC, a New York limited liability company, as a guarantor ("New Cotai Ventures"), NEW COTAI CAPITAL CORP., a British Virgin Islands company, as a guarantor ("New Cotai Capital" and together with Holdings and New Cotai Ventures, LLC, the "Guarantors" and each, a "Guarantor"), the various financial institutions and other Persons from time to time parties hereto and listed on the signature pages hereto and their respective successors and assigns and permitted assigns which become "Lenders" as provided herein (the "Lenders") and SILVER POINT FINANCE, LLC, as the administrative agent and the collateral agent (in such capacities, the "Administrative Agent"). All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, on May [_], 2019 (the "Petition Date"), the Loan Parties (as defined below) commenced voluntary cases (collectively, the "Chapter 11 Case") under Title 11 of the United States Code, 11 U.S.C. §§101, et. seq. (as now or hereafter in effect, or any successor thereto, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and such Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide a secured debtor-in-possession multiple-draw term credit facility to the Borrower in an aggregate principal amount not to exceed $6,250,000 (the "DIP Facility") to (i) fund operating expenses and general corporate and working capital requirements of the Loan Parties, and administrative expenses of the Chapter 11 Case, in each case in compliance with the terms hereof and (ii) pay costs, expenses, interest and other Obligations owing to the Lenders under the DIP Facility;

WHEREAS, the Lenders are willing to make certain loans at the request of the Borrower in an aggregate principal amount not to exceed the Commitments under the DIP Facility upon the terms and conditions set forth herein;

WHEREAS, the Guarantors are willing to guarantee all of the Obligations of the Borrower to the Lender under the Credit Documents;

WHEREAS, each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Loan Parties hereunder and under the other Credit Documents, each of the Loan Parties will provide to the Lender the Liens, status and protection set forth in Sections 2.08, 7.16 and 11.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

SECTION 1. <u>Definitions and Accounting Terms</u>.

1.01      <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Alternate Base Rate" shall mean, on any date and with respect to all ABR Loans, a fluctuating rate of interest per annum (rounded upward, if necessary, to the next highest 1/16 of 1%) equal to the higher of (a) the greater of (I) 2.0% per annum and (II) the greater of (x) the Base Rate in effect on such day and (y) the Federal Funds Rate in effect on such day plus ½ of 1%; and (b) the LIBO Rate.

"ABR Borrowing" shall mean a Borrowing comprised of ABR Loans

"ABR Loan" shall mean any Loan bearing interest at a rate determined by reference to the Alternative Base Rate.

"<u>Acceptable Plan</u>" shall mean a plan of reorganization of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code proposed by the Loan Parties which provides for the payment in full in cash of the DIP Facility, on or prior to the Maturity Date.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary contained above, for purposes of Section 9.05, neither the Administrative Agent nor any Lender nor any of their affiliates shall be deemed to constitute an Affiliate of any Loan Party in connection with the Credit Documents or its dealings or arrangements relating thereto.

"<u>Agreement</u>" shall mean this Secured Debtor-in-Possession Credit Agreement, as modified, supplemented, amended or restated from time to time.

"<u>Avoidance Actions</u>" shall mean actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" shall have the meaning provided in the Recitals hereto.

"<u>Bankruptcy Court</u>" shall have the meaning provided in the Recitals hereto.

"<u>Base Rate</u>" shall mean, at any time, an annual rate equal to the rate of interest in effect for such day as publicly announced from time to time by JPMorgan Chase as its

2

"prime rate" for Dollars loaned in the United States. The "prime rate" is a rate set by JPMorgan Chase based upon various factors including JPMorgan Chase's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowing" shall mean the borrowing of Loans from the Lender on a given date.

"Borrowing Date" shall mean each date on which a Credit Event occurs.

"Business Day" shall mean any day except Saturday, Sunday and any day which shall be in New York City a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"Carve-Out" shall have the meaning provided in the Final Order.

"Change of Control" shall mean the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)) other than a wholly-owned Subsidiary of the Borrower; (ii) the first day on which Holdings ceases to own 100% of the outstanding Equity Interests of the Borrower; or (iii) an event or series of events occurring after the Effective Date by which any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) excluding Permitted Holders becomes the beneficial owner, directly or indirectly, of 35% or more of the equity securities of Holdings or the Borrower entitled to vote for members of the board of directors or equivalent governing body of Holdings or the Borrower on a fully-diluted basis.

"Chapter 11 Case" shall have the meaning provided in the Recitals hereto.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall have the meaning specified in Section 11.

"Commitment" shall mean the commitment of a Lender to make or otherwise fund the Loans hereunder pursuant to Section 2.1, as the same may be reduced from time to time or terminated pursuant to Section 10, and "Commitments" means such commitments of all such Lenders in the aggregate.  The amount of each Lender's Commitment as of the Effective Date is set forth on Schedule I.  The aggregate amount of the Commitments as of the Effective Date is $6,250,000

3

"<u>Credit Documents</u>" shall mean this Agreement, each Note, each Security Document and, after the execution and delivery thereof, each additional guaranty or additional security document executed pursuant to this Agreement.

"<u>Credit Event</u>" shall mean the making of any Loan.

"<u>Default</u>" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"<u>DIP Facility</u>" shall have the meaning provided in the Recitals hereto.

"<u>Dollars</u>" and the sign "<u>$</u>" shall each mean lawful money of the United States.

"<u>Effective Date</u>" shall have the meaning provided in Section 12.09.

"<u>Equity Interests</u>" shall mean (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents of corporate stock and (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited).

"<u>Event of Default</u>" shall have the meaning provided in Section 10.

"<u>Existing Liens</u>" shall have the meaning provided in Section 2.08(a)(iii).

"<u>Federal Funds Rate</u>" shall mean, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; or (b) if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"<u>Final Order</u>" shall mean the final order entered by the Bankruptcy Court with respect to the Loan Parties authorizing and approving the DIP Facility and the terms of this Agreement and the other Credit Documents (including the payment of interest, costs, expenses and other Obligations hereunder and thereunder), substantially in the form of <u>Exhibit A</u> hereto, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).

"<u>Final Order Entry Date</u>" shall mean the date on which the Final Order shall have been entered on the docket of the Bankruptcy Court.

4

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.

"Guaranty" shall mean the guaranty of the Guarantors pursuant to Section 13.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money, (ii) the maximum amount available to be drawn under all letters of credit or bank guaranties issued for the account of such Person and all unpaid drawings in respect of such letters of credit or bank guaranties, (iii) all guaranties of Indebtedness of the types described in clause (i) and (ii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (to the extent of the value of the respective property); provided that Indebtedness shall in any event not include trade payables and expenses accrued in the ordinary course of business.

"Initial Borrowing Date" shall mean the date occurring on or after the Effective Date on which the initial Credit Event hereunder occurs.

"Interest Payment Date" shall mean, (a) with respect to any LIBO Rate Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part, and (b) with respect to any ABR Loan, the last Business Day of each month.

"Interest Period" shall mean the period beginning on (and including) the date on which a Loan is made and shall end on (but exclude) the day which numerically corresponds to such date one month thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month); provided, that, if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and no Interest Period for any Loan may end later than the Maturity Date for such Loan.

"Investments" shall have the meaning provided in Section 9.04.

"LIBO Rate" shall mean, with respect to any Borrowing for any Interest Period, the rate per annum equal to the London Interbank Offered Rate or a successor rate, which rate is approved by the Lenders, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 A.M. (London time), two Business Days prior to the commencement of such Interest Period for Dollar deposits with a one-month term; provided, however, that if the LIBO Rate shall be less than 1.00%, such rate shall be deemed 1.00% for purposes of this Agreement.

"LIBO Rate Borrowing" shall mean a Borrowing comprised of LIBO Rate Loans.

"<u>LIBO Rate Loan</u>" shall mean any Loan bearing interest at a rate determined by reference to the LIBO Rate.

"<u>Lenders</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Lien</u>" shall mean any mortgage, pledge, hypothecation, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever.

"<u>Loan</u>" shall have the meaning provided in Section 2.01(a).

"<u>Loan Party</u>" shall mean the Borrower and each Guarantor.

"<u>Margin Regulations</u>" shall have the meaning provided in Section 5.03.

"<u>Margin Stock</u>" shall have the meaning provided in Regulation U of the Board of Governors of the Federal Reserve System.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the business, property, assets, liabilities, condition (financial or otherwise) or prospects of the Loan Parties taken with respect to the Obligations as a whole, (b) the rights and remedies of the Administrative Agent and the Lenders, taken as a whole or (c) the ability of the Loan Parties, taken as a whole, to perform their Obligations, in any such case, other than as a result of (i) events leading up to, resulting from and following the commencement of the Chapter 11 Case or the continuation and prosecution thereof, and (ii) any items that are publicly available on or prior to the Petition Date.

"<u>Maturity Date</u>" shall mean the earlier to occur of (a) the Stated Maturity Date and (b) the date the Stated Maturity Date is accelerated pursuant to the exercise of remedies under Section 10 as a result of the occurrence of an Event of Default which is continuing.

"<u>MSC Cotai</u>" shall mean MSC Cotai Limited, a company incorporated as a business company limited by shares in the British Virgin Islands.

"<u>New Cotai Investments</u>" means New Cotai Investments, LLC, a Delaware limited liability company.

"<u>New Cotai Participation</u>" means New Cotai Participation Corp., a company limited by shares incorporated in the British Virgin Islands.

"<u>New Cotai Parties</u>" means the Borrower, the Guarantors and New Cotai Participation.

"<u>Note</u>" shall have the meaning provided in Section 2.05(a).

"<u>Notice of Borrowing</u>" shall have the meaning provided in Section 2.03.

6

"<u>Notice Office</u>" shall mean the office of the Administrative Agent located at [_], or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"<u>Oaktree</u>" shall mean Oaktree Capital Management, L.P. and its affiliated funds, including those funds that hold equity in New Cotai Investments.

"<u>Obligations</u>" shall mean (x) the principal of, premium, if any, and interest on the Loans made to, the Borrower under this Agreement and (y) all other obligations, liabilities and indebtedness owing by the Loan Parties to the Administrative Agent and the Lenders under this Agreement and each other Credit Document to which any Borrower is a party (including, without limitation, indemnities and interest thereon (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in this Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with this Agreement and any such other Credit Document.

"<u>Permitted Debt</u>" shall mean (i) Indebtedness incurred pursuant to this Agreement and the other Credit Documents; (ii) Indebtedness of the Loan Parties outstanding on the Petition Date (including any interest and fees accrued thereon after the Petition Date) but not any extension, renewal or replacement of such Indebtedness; (iii) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days and (iv) other Indebtedness incurred in the ordinary course of business and pursuant to an order entered by the Bankruptcy Court.

"<u>Permitted Holder</u>" shall mean Silver Point Capital, Oaktree and any of their respective Affiliates.

"<u>Permitted Liens</u>" shall mean (i) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor; (ii) bankers' Liens, rights of setoff, Liens arising out of judgments or awards not constituting an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made; (iii) Liens created pursuant to the Studio City Shareholders' Agreement as in effect on the Effective Date; (iv) Liens created pursuant to the Participation Agreement as in effect on the Effective Date; (v) Liens created pursuant to the Security Documents and (vi) other Liens created in the ordinary course of business and pursuant to an order entered by the Bankruptcy Court.

"<u>Person</u>" shall mean any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"<u>Petition Date</u>" shall have the meaning provided in the Recitals hereto.

"<u>PIK Indenture</u>" shall mean the Indenture, dated as of April 19, 2013, among the Borrower and New Cotai Capital, as co-issuers, Holdings, as guarantor, and Wells Fargo Bank, National Association, as trustee, as amended, restated, supplemented or otherwise modified from time to time.

"<u>PIK Note Guarantee</u>" shall mean the guarantee by Cotai Holdings of the Issuers' obligations under the PIK Indenture and the PIK Notes, executed pursuant to the provisions of the PIK Indenture.

"<u>PIK Notes</u>" shall mean the 10.625% Senior Pay-In-Kind Notes due 2019 issued pursuant to the PIK Indenture.

"<u>Post-Petition</u>" shall mean the time period beginning immediately upon the filing of the Chapter 11 Case.

"<u>Pre-Petition</u>" shall mean the time period prior to filing of the Chapter 11 Case.

"<u>Pre-Petition Payment</u>" shall mean a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition (i) Indebtedness, (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other Pre-Petition claims against any Borrower.

"<u>Register</u>" shall have the meaning provided in Section 12.14.

"<u>Required Lenders</u>" shall mean, at any time, Lenders holding more than 50% of the aggregate principal amount of the then outstanding Loans.

"<u>Returns</u>" shall have the meaning provided in Section 7.08.

"<u>S&P</u>" shall mean Standard & Poor's Financial Services LLC, and its successors.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended.

"<u>Security Documents</u>" shall mean the Final Order, Section 11 of this Agreement and, after the execution and delivery thereof, each additional security document executed pursuant to this Agreement.

"<u>Silver Point</u>" means Silver Point Finance, LLC.

"<u>Silver Point Capital</u>" means Silver Point Capital, L.P. and its affiliated funds, including those funds that hold equity in New Cotai Investments.

"<u>Stated Maturity Date</u>" shall mean, as such date may be extended in accordance with Section 2.09, the date that is one year following the entry of the Final Order (or if such date is not a Business Day, the next succeeding Business Day).

8

"Studio City" refers to Studio City International and its consolidated Subsidiaries.

"Studio City Agreements" means (i) the Amended and Restated Studio City Shareholders' Agreement, dated October 16, 2018, as amended, among MCE Cotai Investments Limited, the Borrower, Melco Crown Entertainment Limited and Studio City International, as it may be further amended from time to time (the "Studio City Shareholders' Agreement"), (ii) the Participation Agreement, dated October 16, 2018, as amended, among MSC Cotai and Studio City International as it may be further amended from time to time (the "Participation Agreement"), and any other agreement or instrument existing on the date of this Agreement to which Melco Crown Entertainment Limited or any of its subsidiaries and any of the New Cotai Parties together are parties or to which any of the New Cotai Parties is otherwise bound, as each may be amended from time to time

"Studio City International" means Studio City International Holdings Limited, a company incorporated in the British Virgin Islands.

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.

"Tax Benefit" shall have the meaning provided in Section 4.04(c).

"Taxes" shall have the meaning provided in Section 4.04(a).

"Transaction" shall mean, collectively, (i) the entering into of this Agreement and the other Credit Documents, as applicable, on the Effective Date and (ii) the payment of all costs and expenses in connection with the foregoing.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"United States" and "U.S." shall each mean the United States of America.

SECTION 2. Amount and Terms of DIP Facility; Lien Priority.

2.01    The Commitments. (a) Subject to and upon the terms and conditions of this Agreement, upon entry of the Final Order, each Lender having a Commitment identified on Schedule I shall make term loan advances (each a "Loan" and, collectively, the "Loans") to the Borrower in an original principal amount not to exceed the Commitment on an aggregate basis of such Lender. After repayment, the Loans (or any portion thereof) may not be reborrowed.  Notwithstanding anything to the contrary contained in this Agreement or the Final Order, under no circumstances shall the Lenders make Loans exceeding $6,250,000 in the aggregate.

9

2.02    <u>Minimum Amount of Each Borrowing</u>. The aggregate principal amount of each Borrowing of Loans shall not be less than $[_] unless otherwise agreed to by each Lender.

2.03    <u>Notice of Borrowing</u>. (a) Whenever the Borrower desires to incur Loans hereunder, it shall give the Administrative Agent at its Notice Office at least one Business Day's (or less with the consent of each Lender) prior written notice of each Loan to be incurred hereunder, <u>provided</u> that any such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York time) (or later with the consent of each Lender). Each such written notice (each a "<u>Notice of Borrowing</u>") shall be irrevocable and shall be given by the Borrower in a form specifying (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) to which account the proceeds of such Loans are to be deposited and (iv) whether such Borrowing is to be an ABR Borrowing or a LIBO Rate Borrowing.

(b)    Without in any way limiting the obligation of the Borrower to deliver a written Notice of Borrowing in accordance with Section 2.03(a), the Administrative Agent may act without liability upon the basis of telephonic notice of such Borrowing, believed by the Administrative Agent in good faith to be from the Borrower.

2.04    <u>Disbursement of Funds</u>. No later than 1:00 P.M. (New York time) (or such earlier time as each Lender agrees) on the date specified in each Notice of Borrowing, the Lenders will make available in Dollars and in immediately available funds to the Borrower each such Borrowing requested to be made on such date, in the account specified in the applicable Notice of Borrowing.

2.05    <u>Notes</u>. (a) The Borrower's obligation to pay the principal of, and interest on, the Loans made by the Lenders shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 12.14 and shall, if requested by any Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in form and substance reasonably acceptable to such Lender (the "<u>Note</u>").

(b)    The Note issued to such Lender shall (i) be executed by the Borrower, (ii) be payable to such Lender or its registered and permitted assigns and be dated the Effective Date, (iii) be in a stated principal amount equal to the outstanding Loans of such Lender at such time and be payable in the outstanding principal amount of the Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in Section 2.06 in respect of the Loans evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 4.01, and mandatory repayment as provided in Section 4.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)    Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and will, prior to any transfer of the Note, endorse on the reverse side thereof the outstanding principal amount of Loans evidenced

thereby. Failure to make any such notation or any error in any such notation or endorsement shall not affect the Borrower's obligations in respect of any Loans made or repaid pursuant to this Agreement and the other Credit Documents.

(d)    No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower that would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guarantees therefor provided pursuant to the Credit Documents. At any time (including, without limitation, to replace any Note that has been destroyed or lost) when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to such Lender the requested Note in the appropriate amount or amounts to evidence such Loans; provided that, in the case of a substitute or replacement Note, the Borrower shall have received from such Lender (i) an affidavit of loss or destruction and (ii) a customary lost/destroyed Note indemnity, in each case in form and substance reasonably acceptable to the Borrower and such Lender, and duly executed by such Lender.

2.06    Interest. (a) The Borrower agrees to pay interest in respect of the unpaid principal amount of each Loan from the date the proceeds thereof are made available to the Borrower until the maturity (whether by acceleration or otherwise) of such Loan at a rate per annum equal to (x) in the case of LIBO Rate Loans, the LIBO Rate plus 7.0% and (y) in the case ABR Loans, the Alternative Base Rate plus 6.0%.

(b)    If the Borrower fails to pay any amount payable by them under a Credit Document on its due date, then at the written election of the Lender by notice to the Borrower, interest shall accrue on the overdue amount (in the case of overdue interest to the extent permitted by law) from the due date up to the date of actual payment (both before and after judgment) at a rate which is 2% plus, in the case of any overdue principal amount on any Loan, the interest rate payable on such Loan pursuant to Section 2.06(a). Any interest accruing under this Section 2.06(b) shall be immediately payable by the Borrower on demand by the Lender.

(c)    Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount on the Interest Payment Date but will remain immediately due and payable.

(d)    Accrued and unpaid interest shall be payable in respect of each outstanding Loan on the Interest Payment Date for such Loan, on any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

2.07    No Discharge; Survival of Claims. Until the Obligations are paid in cash in full and the Commitments have been terminated, the Borrower agrees that (i) their Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Liens granted to the

Lender pursuant to the Final Order and pursuant to this Agreement and the other Credit Documents shall not be affected in any manner by the entry of an order confirming any plan of reorganization that does not provide for the Obligations to be paid in cash in full and the Commitments to be terminated.

2.08    Priority and Liens.

(a)    Liens and Priority. Each of the Loan Parties hereby covenants, represents and warrants that, upon entry of the Final Order, the Obligations authorized by the Final Order of the Loan Parties under the Credit Documents:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, the obligations of the Loan Parties hereunder shall constitute obligations of the Loan Parties with priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims under Sections 105, 326, 328, 330, 331, 506(c), 507(a) or 726 of the Bankruptcy Code;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Lenders, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all Collateral wherever located, and any proceeds and products thereof, whether existing on Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date; and

(iii)    pursuant to Section 364(c)(3) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Lenders, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all Collateral that is subject to valid, perfected and unavoidable liens (if any) in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date but perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Existing Liens").

The Lien of the Administrative Agent securing the Obligations shall be senior to any Liens granted by any Loan Party on or after the Petition Date (including, without limitation, any replacement Liens granted pursuant to a Bankruptcy Court order approving the use of any cash collateral).

The liens and claims of or granted to the Administrative Agent in the Final Order and the Credit Documents will be subject and subordinate to the payment, without duplication, of the Carve-Out;

provided that, except as otherwise provided in the Final Order, no portion of the Carve-Out shall be utilized for the payment of professional fees and expenses incurred in connection with any challenge to the amount, extent, priority, validity, perfection or

12

enforcement of the Indebtedness of the Loan Parties owing to the Lenders or indemnified parties under the DIP Facility or to the collateral securing the DIP Facility. The Lenders agree that so long as no Event of Default shall have occurred and be continuing, the Loan Parties shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out. The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Lenders to object to the allowance and payment of such amounts.

(b)      No Filing Required.   The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Final Order and entry of the Final Order shall have occurred on or before the date of each Loan.  The Administrative Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Security Agreement, the Final Order or any other Credit Document.

(c)      Collateral Security Perfection. Notwithstanding the provisions of Section 2.08(b), the Loan Parties agree to take all action that the Administrative Agent may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens, upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby.  Each Loan Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file in any filing office in any jurisdiction any initial financing statements and amendments thereto that (a) use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", words of similar import or any other description the Administrative Agent, in its sole discretion, so chooses in any such financing statements, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Each Loan Party agrees to furnish any such information to the Administrative Agent promptly upon request. Notwithstanding the provisions of this Section 2.08(c), the Administrative Agent shall have the benefits of the Final Order as set forth in Section 5.02 hereof.

2.09      Extension of Maturity Date. The Borrower shall have an option to extend the Maturity Date then in effect for one (1) additional term, not longer than twelve (12) months, subject to satisfaction of the following conditions precedent: the Borrower shall have delivered a written request to extend the Stated Maturity Date to the Administrative Agent not less than five (5) Business Days prior to the Stated Maturity Date then in effect (which shall be promptly forwarded by the Administrative Agent to each Lender) and no Default or Event of Default shall have occurred and be continuing on the date of the delivery of the written request.

2.10      Fees. The Borrower shall pay to the Administrative Agent for the ratable account of the Lenders, upon entry of the Final Order, a commitment fee in an amount equal to 1.00% times the result of the aggregate amount of the Commitments. All such fees shall be non-refundable.

SECTION 3. [Reserved].

SECTION 4. Prepayments; Payments; Taxes; Application of Proceeds.

4.01      Voluntary Prepayments. The Borrower shall have the right to prepay the Loans, without premium or penalty except as provided by law, in whole or in part at any time and from time to time on the following terms and conditions:

(a)      the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York time) at its Notice Office at least one Business Day's prior written notice (including e-mail notice or telephonic notice promptly confirmed in writing) of its intent to prepay such Loans and the date and amount of such prepayment; and

(b)      each prepayment shall be in an aggregate principal amount of at least $[_] or, if less, any remaining principal amount of Loans outstanding.

4.02      Mandatory Prepayments.

(a)      Asset Sales. Not later than the third Business Day following the date of receipt by a Loan Party of any net asset sale proceeds, the Borrower shall prepay the Loans in an aggregate amount equal to such net asset proceeds.

(b)      Issuance of Debt. On the date of receipt by a Loan Party of any proceeds from the incurrence of any Indebtedness of a Loan Party (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 9.03), the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds.

4.03      Method and Place of Payment. Except as otherwise specifically provided herein, all payments under this Agreement or any Note shall be made to the Lender not later than 3:00 p.m. (New York time) on the date when due and shall be made in Dollars in immediately available funds at the Notice Office of the Administrative Agent or such other office as the Administrative Agent may hereafter designate in writing. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

4.04      Net Payments; Taxes. (a) All payments made by the Borrower hereunder or under any Note will be made without setoff, counterclaim or other defense. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political

14

subdivision or taxing authority thereof or therein with respect to such payments (but excluding, except as provided in the second succeeding sentence, any tax imposed on or measured by the net income, net profits or any franchise tax based on net income, net profits or net worth, of any Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of the Lender is located or any subdivision thereof or therein) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). If any Taxes are so levied or imposed, the Borrower agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note. If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Borrower agrees to reimburse any Lender, upon the written request of such Lender, for taxes imposed on or measured by the net income, net profits or any franchise tax based on net income, net profits or net worth, of such Lender pursuant to the laws of the jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of the Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which such Lender is organized or in which the principal office or applicable lending office of such Lender is located and for any withholding of taxes as such Lender shall determine are payable by, or withheld from, such Lender, in respect of such amounts so paid to or on behalf of such Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of such Lender pursuant to this sentence. The Borrower will furnish to such Lender within 45 days after the date of payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by the Borrower. The Borrower agrees to indemnify and hold harmless each Lender, and reimburse each Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by each Lender.

(b)    Each Lender agrees to use reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of such Lender) to file any certificate or document or to furnish to the Borrower any information as reasonably requested by the Borrower that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; provided, however, that nothing in this Section 4.04(b) shall require any Lender to disclose any confidential information (including, without limitation, its tax returns or its calculations).

(c)    If the Borrower pays any additional amount under this Section 4.04 to any Lender and such Lender determines in its sole discretion exercised in good faith that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Lender shall pay to the Borrower an amount that such Lender shall, in its sole discretion exercised in good faith, determine is equal to the net benefit, after tax, which was obtained by such Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) such Lender may determine, in its sole discretion exercised in good faith consistent with the policies of such Lender,

15

whether to seek a Tax Benefit, (ii) any Taxes that are imposed on such Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such Lender that otherwise would not have expired) of any Tax Benefit with respect to which the Lender has made a payment to the Borrower pursuant to this Section 4.04(c) shall be treated as a Tax for which the Borrower is obligated to indemnify such Lender pursuant to this Section 4.04 without any exclusions or defenses, (iii) nothing in this Section 4.04(c) shall require any Lender to disclose any confidential information to the Borrower (including, without limitation, its tax returns), and (iv) no Lender shall be required to pay any amounts pursuant to this Section 4.04(c) at any time during which a Default or Event of Default exists.

4.05    Application of Proceeds.    All monies collected by the Administrative Agent upon any sale or other disposition of the Collateral of each Borrower, together with all other monies received by the Administrative Agent hereunder (except to the extent released in accordance with the applicable provisions of this Agreement or any other Credit Document), shall be applied to the payment of the Obligations as follows:

first, to the payment of the portion of Obligations owing to the Administrative Agent constituting indemnities and expenses due and payable under this Agreement and the other Credit Documents;

second, to the payment of the portion of Obligations constituting indemnities and expenses due and payable to the Lenders under this Agreement and the other Credit Documents;

third, to the payment of all amounts owing the Lenders on a pro rata basis under this Agreement and the other Credit Documents; and

fourth, to the extent proceeds remain after the application pursuant to the preceding clauses one through three and the Obligations have been indefeasible paid in full in cash, to the Borrower or such other Person entitled thereto under applicable law.

4.06    Breakage Costs. Upon written demand of any Lender from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate the Lenders for and hold the Lenders harmless from any loss, cost or expense incurred by it as a result of any payment or prepayment of any LIBO Rate Loan on a day prior to the last day of the Interest Period (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise).

SECTION 5. Conditions Precedent to the Initial Borrowing Date. The obligation of the Lenders to make Loans on the Initial Borrowing Date, is subject at the time of the making of such Loans to the satisfaction or waiver of the following conditions:

5.01    Effective Date; Notes. On or prior to the Initial Borrowing Date (i) the Effective Date shall have occurred and (ii) if requested by any Lender, there shall

16

have been delivered to the Note for such Lender executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

5.02     Validity of Liens. On or prior to the Initial Borrowing Date, the Security Documents, upon entry of the Final Order, shall be effective to create in favor of the Lender a legal, valid and enforceable perfected security interest in and lien on the Collateral, with the priority described in Section 2.08, subject to the Carve-Out. All filings, recordings, deliveries of instruments and other actions reasonably requested by the Administrative Agent that are necessary or desirable in the reasonable opinion of the Administrative Agent to protect and preserve such security interests shall have been duly effected.

5.03     Margin Regulations. On the Initial Borrowing Date, all Loans and other financing to be made pursuant to this Agreement shall be in full compliance with all applicable requirements of law, including, without limitation, the provisions of the Regulations T, U and X of the Board of Governors of the Federal Reserve System (the "Margin Regulations").

5.04     No Conflicts. On the Initial Borrowing Date, after the making of the Loans and the performance by the Borrower of the Credit Documents, the financings incurred in connection therewith and the other transactions contemplated hereby, there shall be no conflict with, or default under, any material agreement or contractual or other restriction which is binding for the Borrower other than as permitted by the Final Order.

5.05     Material Adverse Change. Nothing shall have occurred since the Petition Date which could reasonably be expected to have a Material Adverse Effect.

5.06     Fees. The Administrative Agent shall have received the fees required to be paid upon entry of the Final Order by the Borrower hereunder.

SECTION 6. Conditions Precedent to All Credit Events. The obligation of the Lenders to make Loans (including Loans made on the Initial Borrowing Date) is subject, at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction of the following conditions:

6.01     No Default; Representations and Warranties. At the time of each such Credit Event and also immediately after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties of the Loan Parties contained herein or in any other Credit Document shall be true and correct in all material respects both before and after giving effect to such Credit Event with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

6.02     Notice of Borrowing. Prior to the making of each Loan, the Administrative Agent shall have received the Notice of Borrowing required by Section 2.03.

17

6.03    Final Orders.  At the time of each such Credit Event and also after giving effect thereto, (i) the Lender shall have received a copy of the Final Order and the Final Order shall be in full force and effect and shall not have been vacated, reversed or stayed, or modified or amended in any material respect.  If the Final Order is the subject of a pending appeal in any respect, none of the Final Order, the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Credit Documents shall be the subject of a presently effective stay pending appeal. The Loan Parties and the Lenders shall be entitled to rely in good faith upon the Final Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the Final Order has been stayed by a court of competent jurisdiction.

6.04    Expense Reimbursement, etc. At the time of each such Credit Event and also after giving effect thereto, the Borrower shall have paid to the Administrative Agent all costs, expenses and other compensation contemplated in connection with this Agreement payable to the Lenders and the Administrative Agent pursuant hereto to the extent then due and invoiced at least three Business Days prior to such Borrowing Date.

6.05    Outstanding Loans. At the time of each such Credit Event and also after giving effect thereto, the amount of the proposed Credit Event shall not, when aggregated with the outstanding amount of existing Loans, exceed the aggregate amount authorized under the Final Order.

6.06    Material Adverse Change. Nothing shall have occurred since the Petition Date which could reasonably be expected to have a Material Adverse Effect.

The acceptance of the proceeds of each Credit Event shall constitute a representation and warranty by the Borrower to the Lender that all of the applicable conditions specified in Section 5 and in this Section 6 and applicable to such Credit Event have been satisfied as of that time.

SECTION 7. Representations, Warranties and Agreements. In order to induce the Lenders to enter into this Agreement and to make the Loans, the Loan Parties make the following representations, warranties and agreements, in each case on the Effective Date, all of which shall survive the execution and delivery of this Agreement and the Notes (if any) and the making of the Loans, with the occurrence of each Credit Event on or after the Effective Date being deemed to constitute a representation and warranty that the matters specified in this Section 7 are true and correct in all material respects on and as of the Effective Date and on the date of each such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date):

7.01    Corporate/Limited Liability Company/Limited Partnership Status. Each Loan Party (i) is a duly organized and validly existing corporation, limited liability

18

company or limited partnership, as the case may be, (ii) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (iii) is in good standing (to the extent such concept exists) under the laws of the jurisdiction of its incorporation or formation, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except for failures to have such status or to be so qualified which could not reasonably be expected to have a Material Adverse Effect.

7.02    Corporate Power and Authority. Upon entry of the Final Order, each Loan Party has the corporate or other applicable power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary corporate or other applicable action to authorize the execution, delivery and performance by it of each of such Credit Documents. Upon entry of the Final Order, each Loan Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes the legal, valid and binding obligation of such Borrower enforceable against such Loan Party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

7.03    No Violation. Except as could not reasonably be expected to have a Material Adverse Effect, neither the execution, delivery or performance by any Loan Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, will (i) contravene any material provision of any applicable law, statute, rule or regulation or any applicable order, judgment, writ, injunction or decree of any court or governmental instrumentality, or (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the material properties or assets of any Loan Party pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, to which any Loan Party is a party or by which it or any of its material property or assets is bound or to which it may be subject (other than as permitted by the Final Order).  Neither the execution, delivery or performance by any Loan Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, will violate any provision of the Certificate of Incorporation or By-Laws (or equivalent organizational documents) of any Loan Party.

7.04    Governmental Approvals. Except as otherwise provided in the Final Order or to the extent not required by the Credit Documents, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made or, in the case of any filings or recordings in respect of the Security Documents will be made, to the extent required pursuant to the Credit Documents, within ten (10) calendar days of the date such Security Document is required to be executed pursuant hereto), or exemption by, any governmental or public

19

body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance by any Loan Party of any Credit Document to which it is a party or (ii) the legality, validity, binding effect or enforceability of any Credit Document to which any Loan Party is a party against such Loan Party, except entry of the Final Order.

7.05    <u>Material Adverse Change</u>. Since the Petition Date, nothing has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

7.06    <u>Litigation</u>. There are no unstayed actions, suits, investigations (conducted by any governmental or other regulatory body of competent jurisdiction) or proceedings pending or, to the knowledge of any Loan Party, threatened against any Loan Party that could reasonably be expected to have a Material Adverse Effect.

7.07    <u>Use of Proceeds; Margin Regulations</u>. (a) All proceeds of the Loans shall be used only for the following: (i) fund operating expenses and general corporate and working capital requirements of the Loan Parties, and administrative expenses of the Chapter 11 Case, in each case in compliance with the terms hereof and (ii) pay costs, expenses, interest and other Obligations owing to the Lenders under the DIP Facility and shall not be used to (x) finance in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the Administrative Agent or the Lenders or their respective rights and remedies under Credit Documents or the Order or (ii) any other action which with the giving of notice or passing of time would result in an Event of Default under the Credit Documents or (y) make any Pre-Petition Payment without the prior written consent of the Required Lenders.

(b)    No part of the proceeds of any Loan will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock except to purchase or carry or extend credit for the purpose of purchasing or carrying such Margin Stock as may be permitted to be purchased or carried pursuant to the terms of Section 9.04. Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate the Margin Regulations.

7.08    <u>Tax Returns and Payments</u>. Except as could not reasonably be expected to have a Material Adverse Effect or to the extent any of the following is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP: (i) each Loan Party has timely filed all U.S. federal income tax returns, statements, forms and reports for taxes and all other material U.S. and material non-U.S. tax returns, statements, forms and reports for taxes required to be filed by or with respect to the income, properties or operations of such Loan Party (the "<u>Returns</u>") and (ii) the Loan Parties have at all times paid, or have provided adequate reserves (in accordance with GAAP) for the payment of, all taxes shown as due on the Returns and all other material U.S. federal, state and non-U.S. taxes payable by them.

7.09     The Security Documents. After the execution and delivery thereof, upon entry of the Final Order each of the Security Documents creates in favor of the Administrative Agent a legal, valid and enforceable fully perfected Lien on all right, title and interest of the Loan Parties party thereto in the Collateral described therein, with the priority described in Section 2.08, subject to no other Liens except for Permitted Liens.

7.10     Compliance with Statutes, etc. Each Loan Party is in compliance in all material respects with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances that could not reasonably be expected to have a Material Adverse Effect.

7.11     Insurance. The properties and business of the Loan Parties are insured, including pursuant to policies of the type specifically required pursuant to Section 8, with financially sound and reputable insurance companies which may be Affiliates of the Loan Parties, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party operates.

7.12     [Reserved].

7.13     Final Order. (a) The Final Order is in full force and effect, and has not been reversed, stayed or vacated or amended or modified in any material respect absent the written consent of the Required Lenders.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender shall, subject to the provisions of Section 10 and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)     If the Final Order is the subject of a pending appeal in any respect, none of the Final Order, the making of the Loans or the performance by any of the Loan Parties of any of their obligations under any of the Credit Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties and the Lenders shall be entitled to rely in good faith upon the Final Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the Final Order has been stayed by a court of competent jurisdiction.

7.14     Appointment of Trustee or Examiner; Liquidation. No order has been entered in the Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of a responsible officer or an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under

21

Section 1106(b) of the Bankruptcy Code or (iii) to convert the Chapter 11 Case to a case under Chapter 7 or to dismiss the Chapter 11 Case.

7.15    Perfection of Security Interest. Upon entry of the Final Order, such Final Order is effective to create in favor of the Administrative Agent a legal, valid and enforceable security interest in the Collateral and proceeds thereof.

7.16    Liens. On and after the Effective Date and the entry of the Final Order, such Final Order, this Agreement and the Credit Documents are sufficient to provide the Liens described in, and with the priority provided in, Section 2.08 of this Agreement.

SECTION 8.    Affirmative Covenants. Each Loan Party hereby covenants and agrees that, on and after the Effective Date, and until the Commitments have terminated and the Loans, together with interest, and all other Obligations, are paid in full in cash:

8.01    Maintenance of Property; Insurance. The Loan Parties will (i) keep all material property necessary in its business in good working order and condition (ordinary wear and tear and loss or damage by casualty or condemnation excepted), and (ii) maintain insurance on the Collateral in at least such amounts and against at least such risks as are in accordance with normal industry practice for similarly situated insureds.

8.02    Compliance with Statutes, etc. Each Loan Party will comply with all applicable statutes, regulations and orders of, and all applicable restrictions (including all laws and regulations relating to money laundering) imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances as could not reasonably be expected to have a Material Adverse Effect.

8.03    Use of Proceeds. The Loan Parties will use the proceeds of the Loans only as provided in Section 7.07.

8.04    Performance of Post-Petition Obligations. Each Loan Party will perform all of its material Post-Petition contractual obligations.

8.05    Payment of Taxes. Except as could not reasonably be expected to have a Material Adverse Effect or to the extent any of the following is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP, each Loan Party will pay and discharge all material Post-Petition taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien not otherwise permitted under Section 9.01.

22

SECTION 9. <u>Negative Covenants</u>. Each Loan Party hereby covenants and agrees that on and after the Effective Date and until all Commitments have terminated and the Loans, together with interest, and all other Obligations, are paid in full in cash:

9.01    <u>Liens</u>. None of the Loan Parties will create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Loan Parties, whether now owned or hereafter acquired; <u>provided</u> that the provisions of this Section 9.01 shall not prevent the creation, incurrence, assumption or existence of any Permitted Liens.

9.02    <u>Consolidation, Merger, Purchase or Sale of Assets, etc.</u> None of the Loan Parties will wind up, liquidate or dissolve its affairs or enter into any transaction of merger, consolidation or amalgamation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or any part of its property or assets, or enter into any sale-leaseback transactions involving any of the property or assets of the Loan Parties, or purchase or otherwise acquire (in one or a series of related transactions) all or substantially all of the property or assets of any Person or a majority of the Equity Interests of any Person, except that:

(i)    the Loan Parties may make any such dispositions, purchases or acquisitions in the ordinary course of business and pursuant to an order entered by the Bankruptcy Court;

(ii)    the Loan Parties may convey, sell or otherwise dispose of assets in accordance with an Acceptable Plan; and

(ix)    the Loan Parties may make Investments permitted by Section 9.04.

9.03    <u>Indebtedness</u>. None of the Loan Parties will incur, assume or suffer to exist any Indebtedness other than Permitted Debt.

9.04    <u>Advances, Investments and Loans</u>. None of the Loan Parties will lend money or make advances to any other Person or make any capital contribution to any other Person (each of the foregoing an "<u>Investment</u>" and, collectively, "<u>Investments</u>"), except that:

(i)    the Loan Parties may acquire and hold cash equivalents and other short-term investments satisfying the operational guidelines in effect from the United States Trustee for Region 2;

(iii)    Investments existing on the Effective Date;

(v)    the Loan Parties may make other Investments in the ordinary course of business and pursuant to an order entered by the Bankruptcy Court.

9.05    <u>Transactions with Affiliates</u>. None of the Loan Parties will enter into any transaction or series of related transactions with any Affiliate of such Person, other than (i) in the ordinary course of business, (ii) pursuant to an order entered by the

23

Bankruptcy Court, (iii) on terms and conditions no less favorable to such Person as would be obtained by such Person at that time in a comparable arm's-length transaction with a Person other than an Affiliate, (iv) [reserved], (v) transactions in existence on the Effective Date, [(vi) the transactions contemplated by the Studio City Agreement] and (vii) payment of directors' fees, reimbursement of reasonable expenses of directors and officers and indemnification of directors and officers in the ordinary course of business.

9.06    Pre-Petition Payments. None of the Loan Parties will make any Pre-Petition Payment other than (i) as permitted under the Final Order, or (ii) any Pre-Petition Payment permitted by order of the Bankruptcy Court and approved by the Required Lenders.

9.07    Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payment of Claims. None of the Loan Parties will:

(a)    prior to the date on which the Obligations have been paid in cash in full and the Commitments have been cancelled and terminated, (i) pay any administrative expense claims of the Loan Parties except (A) the Obligations then due and payable hereunder or (B) other administrative expense and professional claims then due and payable in the ordinary course of the business of the Loan Parties or the Chapter 11 Case, or otherwise authorized by the Bankruptcy Court, in each case to the extent and having the order of priority set forth in the Final Order or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations to be paid in cash in full and for the Commitments to be cancelled and terminated; and

(b)    seek or consent to a sale of substantially all of the Collateral unless all of the Obligations are to be paid (or repaid) in full in cash from the proceeds thereof and the Commitments terminated.

9.08    Restrictions on Activities.

(a)    Neither the Borrower nor Holdings will (i) hold any material assets other than cash and Cash Equivalents and (A) solely in the case of the Borrower, its interests in the Equity Interests of New Cotai Capital and Studio City International and related rights as a holder of such equity and (B) solely in the case of the Holdings, its interest in the Equity Interests of the Borrower and related rights as a holder of such equity, (ii) become liable for any material obligations other than (A) the PIK Notes and the PIK Note Guarantee, (B) Permitted Debt and [(C) obligations pursuant to the Studio City Agreements] and (D) other obligations permitted pursuant to an order entered by the Bankruptcy Court, (iii) create any new Subsidiaries or (iv) engage in any business activities other than as necessary to (A) maintain its limited liability existence and (B) perform its obligations, including under this Agreement, the Security Documents, the PIK Notes, the PIK Indenture, the PIK Note Guarantee and the Studio City Agreements pursuant to an order entered by the Bankruptcy Court.

(b)    New Cotai Capital Corp. will not hold any material assets, become liable for any material obligations or engage in any business activities other than as necessary to (i) maintain its corporate existence and (ii) perform its obligations under this Agreement, the Security Documents, the PIK Notes and the PIK Indenture pursuant to an order entered by the Bankruptcy Court.

SECTION 10. <u>Events of Default</u>. Upon the occurrence of any of the following specified events (each an "<u>Event of Default</u>"):

10.01    <u>Payments</u>. Any Loan Party shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note or any other amounts owing under any Credit Documents; or

10.02    <u>Representations, etc.</u> Any representation or warranty made by any Loan Party herein or in any other Credit Document shall prove to be untrue in any material respect on the date as of which made or deemed made; or

10.03    <u>Covenants</u>. Any Loan Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 2.07 or 8.03 or Section 9 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document and, in the case of this clause (ii), such default shall continue unremedied for a period of 30 days after written notice to the Loan Parties by the Administrative Agent; or

10.04    <u>Security Documents</u>. At any time after the execution and delivery thereof, any of the Security Documents shall cease to be in full force and effect, or shall cease in any material respect to give the Administrative Agent the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral), in favor of the Administrative Agent, superior to and prior to the rights of all third Persons (except in connection with Permitted Liens), and subject to no other Liens (except Permitted Liens); or

10.05    <u>Guarantees</u>. After the execution and delivery thereof, any Guaranty, or any provision thereof, shall cease to be in full force or effect as to any Guarantor or any Guarantor (or Person acting by or on behalf of such Guarantor) shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party; or

10.06    <u>Judgments</u>. One or more Post-Petition judgments or decrees that could reasonably be expected to have a Material Adverse Effect (after giving effect to any coverage by a reputable and solvent insurance company) shall be entered against any Loan Party, and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days; or

10.07    <u>Change of Control</u>. A Change of Control shall occur; or

10.08    Dismissal or Conversion of Chapter 11 Case. The Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Commitments and the payment in full in cash of all Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Loan Parties shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Lender; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Case; or

10.09    Relief from Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to permit any actions that could reasonably be expected to have a Material Adverse Effect; or

10.10    Final Order. (i) an order shall be entered reversing, amending, supplementing, staying for a period of 10 days or more, vacating or otherwise materially amending, supplementing or modifying the Final Order without the prior written consent of the Required Lenders, or any Loan Party shall apply for authority to do so, without the prior written consent of the Required Lenders, (ii) the Final Order shall cease to create a valid and perfected Lien (subject to Permitted Liens) on the Collateral, with the priority described in Section 2.08, or otherwise cease to be valid and binding and in full force and effect, (iii) any of the Loan Parties shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Lenders) of the Final Order, or (iv) if any Loan Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs; or

10.11    Pre-Petition Payments. Except as permitted by the DIP Facility, the Final Order, or as otherwise agreed to by the Lender, the Loan Parties shall make (or shall have made) any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court; or

10.12    Invalid Plan. A reorganization plan other than an Acceptable Plan shall be filed by any Borrower in the Chapter 11 Case; or

10.13    Disgorgement. The Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Lender of any amounts received in respect of the Obligations; or

10.14    Sale of Assets. The Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of all or substantially all of the assets, properties or Equity Interests of any Loan Party pursuant to Section 363 of the Bankruptcy Code unless such order or orders contemplate the repayment in full in cash of

26

and termination in full of all Commitments and Obligations under the DIP Facility upon consummation of such sale, transfer, lease, exchange, alienation or other disposition; or

10.15    Right to File Chapter 11 Plan.    The entry of an order by the Bankruptcy Court terminating the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or

10.16    Entry of Order.    The Final Order Entry Date shall not have occurred within 55 days after the Petition Date;

then, subject to the terms, conditions and provisions of the Final Order, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, acting at the direction of the Required Lenders, without any action or approval of the Bankruptcy Court, shall after seven days' written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Lenders or the holder of any Note to enforce its claims against any Borrower: (i) declare the Commitments terminated, whereupon all Commitments of the Lenders shall forthwith terminate immediately without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind (except to the extent notice is expressly required pursuant to any order of the Bankruptcy Court or any Credit Document), all of which are hereby waived by each Loan Party; and (iii) enforce all of the Liens and security interests created pursuant to the Security Documents. In addition, upon expiration of the seven day notice period referred to above, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Administrative Agent, acting at the direction of the Required Lenders, shall be entitled to exercise all of its respective rights and remedies under the Credit Documents.

SECTION 11. Security Agreement; Grant of Liens.    Each Loan Party hereby grants to the Administrative Agent, for the ratable benefit of the Lenders, a security interest in all of the Collateral (as hereinafter defined), whether now owned or at any time hereafter acquired by such Borrower or in which such Borrower now has or at any time in the future may acquire any right, title or interest, in each case whether tangible or intangible, wherever located, and whether now owned by such Borrower or hereafter acquired and whether now existing or hereafter coming into existence, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.  As used herein, "Collateral" means all now owned or hereafter acquired assets and property, whether real or personal, of the Loan Parties including, without limitation,  all assets and property pledged under the Credit Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), receivables, receivables records, other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, as-extracted collateral, investment property, inventory, deposit accounts (including the

cash collection, "lockbox" and "concentration" accounts provided for in the Credit Documents), "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commodity accounts, commodity contracts, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing. For the avoidance of doubt, the Collateral shall not include Avoidance Actions, but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions.

SECTION 12. Miscellaneous.

12.01    Payment of Expenses, etc. Each Loan Party agrees that it shall: (i) pay all reasonable out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, the reasonable fees and disbursements of a single counsel to the Administrative Agent) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, and the consummation and administration of the transactions contemplated hereby and thereby, and of the Administrative Agent in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein; (ii) pay and hold the Administrative Agent and each Lender harmless from and against any and all present and future stamp, documentary, transfer, sales and use, value added, excise and other similar taxes with respect to the foregoing matters and save the Administrative Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Administrative Agent or such Lender) to pay such taxes; and (iii) indemnify each of the Administrative Agent and each Lender, and each of its officers, directors, trustees, employees, representatives and agents from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of any investigation, litigation or other proceeding related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of any transactions contemplated herein, or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents.

12.02    Right of Setoff. Subject to the Final Order and in addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Bankruptcy

Court, any Loan Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Lenders to or for the credit or the account of any Loan Party but in any event excluding assets held in trust for any such Person against and on account of the Obligations and liabilities of such Loan Party (whether or not such Obligations are then due), to the Lenders under this Agreements or under any of the other Credit Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Lenders shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured. The rights of the Lenders under this Section 12.02 are in addition to other rights and remedies which it may have upon the occurrence and during the continuance of any Event of Default under the Credit Documents or the Final Order.

12.03    Notices. Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including facsimile or e-mail communication) and mailed, faxed, e-mailed or delivered: if to any Loan Party, at the address specified under its signature below; if to the Administrative Agent, at its Notice Office and if to any Loan Party, at the address specified under its signature below; or, in any such case, at such other address as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall, (i) when mailed, be effective three Business Days after being deposited in the mails, prepaid and properly addressed for delivery, (ii) when sent by overnight courier, be effective one Business Day after delivery to the overnight courier prepaid and properly addressed for delivery on such next Business Day, or (iii) when sent by facsimile or e-mail, be effective when received by such party.

12.04    Benefit of Agreement. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that (i) no Loan Party may assign, transfer, hypothecate or otherwise convey any of its rights, obligations, benefits or interest hereunder or under any other Credit Document without the prior written consent of the Required Lenders, and (ii) each Lender may, with the consent of the Borrower, transfer, assign or grant participations in its rights hereunder; provided that such Lender shall not transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest thereon or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by any Loan Party of any of their rights and obligations under this Agreement or (z) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the

29

Credit Documents) securing the Loans hereunder in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against any Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

12.05    No Waiver; Remedies Cumulative. No failure or delay on the part of the Administrative Agent, any Lender or any holder of any Note in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between any Borrower and the Administrative Agent, any Lender or the holder of any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, any Lender or the holder of any Note would otherwise have. No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, any Lender or the holder of any Note to any other or further action in any circumstances without notice or demand (in any such case, except to the extent notice is expressly required pursuant to any order of the Bankruptcy Court or any Credit Document).

12.06    Calculations; Computations. All computations of interest for Loans hereunder shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed (including the first day but excluding the last day).

12.07    **GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;  WAIVER OF JURY TRIAL. (a) THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE. EXCEPT IN SO FAR AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE MATTER, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, MAY, IF BY THE LENDERS OR THE ADMINISTRATIVE AGENT, AND SHALL, IF BY ANY LOAN PARTY, BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE, LOCATED IN NEW YORK COUNTY IN THE CITY OF NEW YORK, ANY APPELLATE COURT FROM ANY THEREOF AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT**

30

OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH BANKRUPTCY COURT, OR IF SUCH COURT DECLINES JURISDICTION, IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH LOAN PARTY HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH LOAN PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH LOAN PARTY. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b) EACH LOAN PARTY FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED MAIL, POSTAGE PREPAID, TO THE RELEVANT LOAN PARTY AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN ANY OTHER JURISDICTION. IF AT ANY TIME DURING WHICH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT REMAINS IN EFFECT, ANY LOAN PARTY DOES NOT MAINTAIN A REGULARLY FUNCTIONING OFFICE IN NEW YORK CITY, IT WILL DULY APPOINT, AND AT ALL TIMES MAINTAIN, AN AGENT IN NEW YORK CITY FOR THE SERVICE OF PROCESS OR SUMMONS, AND WILL PROVIDE TO THE ADMINISTRATIVE AGENT WRITTEN NOTICE OF THE IDENTITY AND ADDRESS OF SUCH AGENT FOR SERVICE OF PROCESS OR SUMMONS; **PROVIDED** THAT ANY FAILURE ON THE PART OF THE LOAN PARTIES TO COMPLY WITH THE FOREGOING PROVISIONS OF THIS SENTENCE SHALL NOT IN ANY WAY PREJUDICE OR LIMIT THE SERVICE OF PROCESS OR SUMMONS IN ANY OTHER MANNER DESCRIBED ABOVE IN THIS SECTION 12.07 OR OTHERWISE PERMITTED BY LAW.

(c) SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES ANY

**OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

**(d)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

12.08    Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Loan Parties and the Administrative Agent.

12.09    Effectiveness. This Agreement shall become effective on the date (the "Effective Date") on which (i) the Loan Parties who are initially party hereto, the Lenders and the Administrative Agent shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent, and (ii) the Bankruptcy Court shall have entered the Final Order, which Final Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed; provided that (x) if such Final Order is the subject of a pending appeal in any respect, none of such Final Order, the initial extensions of credit, or the performance by any of the Loan Party of any of the Obligations shall be the subject of a presently effective stay pending appeal, (y) the Loan Parties, the Lenders and the Administrative Agent shall be entitled to rely in good faith upon such Final Order, notwithstanding objection thereto or appeal therefrom by any interested party and (z) the Loan Parties, the Lenders and the Administrative Agent shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction. The Administrative Agent will give the Borrower prompt written notice of the occurrence of the Effective Date.

12.10    Headings Descriptive. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

12.11    Amendment or Waiver; etc. (a) Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Borrower and the Required Lenders; provided, that no such change,

waiver, discharge or termination shall affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) unless consented to by the Administrative Agent.

12.12    Survival. All indemnities set forth herein shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Loans.

12.13    Confidentiality. (a) Subject to the provisions of clause (b) of this Section 12.13, each of the Lenders and the Administrative Agent agrees that it will use its best efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel; provided such Persons shall be subject to the provisions of this Section 12.13 to the same extent as the Lender) any information with respect to the Loan Parties which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that the Lender may disclose any such information (a) as has become generally available to the public other than by virtue of a breach of this Section 12.13(a) by any Lender or the Administrative Agent, (b) as may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over any Lender or the Administrative Agent, (c) as may be required in respect to any summons or subpoena or in connection with any litigation (provided that to the extent permitted by law, any Lender or the Administrative Agent shall promptly notify the Borrower thereof), and (d) in order to comply with any law, order, regulation or ruling applicable to any Lender or the Administrative Agent.

(b)    Except as otherwise provided in this Section 12.13, each Lender and the Administrative Agent will use all confidential information provided to it hereunder by or on behalf of the Loan Parties solely for the purpose of providing the services which are the subject of this Agreement and shall treat confidentially all such information and this Agreement and the other Credit Documents (and the respective terms and substance set forth herein and therein).

12.14    Register. Each Loan Party hereby designates the Administrative Agent to serve as such Loan Party's agent, solely for purposes of this Section 12.14, to maintain a register (the "Register") on which it will record the Commitments, the Loans made and each repayment and prepayment in respect of the principal amount of the Loans. Failure to make any such recordation, or any error in such recordation shall not affect the Loan Parties' obligations in respect of such Loans. The transfer of the Commitments and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.

12.15    Judgment Currency. If for the purposes of obtaining judgment in any court it is necessary to convert a sum due from the Loan Parties hereunder or under any of the Notes in the currency expressed to be payable herein or under the Notes (the

"specified currency") into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Lenders could purchase the specified currency with such other currency at the Lender's London office on the Business Day preceding that on which final judgment is given. The obligations of the Loan Parties in respect of any sum due to any Lender hereunder or under any Note shall, notwithstanding any judgment in a currency other than the specified currency, be discharged only to the extent that on the Business Day following receipt by such Lender of any sum adjudged to be so due in such other currency the Lender may in accordance with normal banking procedures purchase the specified currency with such other currency; if the amount of the specified currency so purchased is less than the sum originally due to any Lender in the specified currency, each Loan Party agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify such Lender against such loss, and if the amount of the specified currency so purchased exceeds the sum originally due to the Lender in the specified currency, such Lender agrees to remit such excess to the Loan Parties.

12.16    Language. All correspondence, including, without limitation, all notices, reports and/or certificates, delivered by any Loan Party to the Administrative Agent shall, unless otherwise agreed by the respective recipients thereof, be submitted in the English language or, to the extent the original of such document is not in the English language, such document shall be delivered with a certified English translation thereof.

12.17    Waiver of Immunity. Each Loan Party, in respect of itself, its and their process agents, and its and their properties and revenues, hereby irrevocably agrees that, to the extent that any Loan Party or any of its or their properties has or may hereafter acquire any right of immunity from any legal proceedings to enforce or collect upon the Obligations of the Loan Parties related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, the Loan Parties hereby expressly waive, to the fullest extent permissible under applicable law, any such immunity, and agree not to assert any such right or claim in any such proceeding.

12.18    Order. In the event of any inconsistency between the terms and conditions of any of the Credit Documents and the Final Order, whichever is in effect at the time of reference thereto, the provisions of the Final Order shall govern and control.

12.19    Parties Including Trustees; Bankruptcy Court Proceedings. This Agreement, the other Credit Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Credit Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of any Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Credit Documents shall be binding upon, and inure to the benefit of, the Administrative Agent, the Lenders and their permitted assigns, transferees

34

and endorsees. Until the Commitments have expired or have been terminated and the principal of and interest on each Loan and all other Obligations payable hereunder shall have been paid in full in cash, the Liens created by this Agreement and the other Credit Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens under applicable law. Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Administrative Agent shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, each Lender and the Administrative Agent with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Credit Documents.

SECTION 13. Guaranty.

13.01    Guaranty. In order to induce the Lenders to enter into this Agreement and to extend credit hereunder and in recognition of the direct benefits to be received by the Guarantors from the proceeds of the Loans, each of the Guarantors hereby agrees with the Lenders as follows: Each of the Guarantors hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety, the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Obligations of the Borrower and the other Guarantors to the Lenders and agrees that their obligations are joint and several with the other Borrower hereunder and under the other Credit Documents. If any or all of the Obligations of the Borrower to the Lenders becomes due and payable hereunder, each Guarantor unconditionally and irrevocably, promises to pay such indebtedness to the Lenders, or order, on demand, together with any and all reasonable documented out-of-pocket expenses which may be incurred by the Lenders in collecting any of the Obligations. If a claim is ever made upon the Lenders for repayment or recovery of any amount or amounts received in payment or on account of any of the Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event, each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the Guarantor, notwithstanding any revocation of this Guaranty or other instrument evidencing any liability of the Borrower, and such Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.02    Nature of Liability. The liability of the Guarantors hereunder is primary, absolute, joint and several, and unconditional and is exclusive and independent of any security for or other guaranty of the indebtedness of the other Guarantor, whether

executed by such Guarantor, any other Guarantor, any other guarantor or by any other party, and the liability of each Borrower hereunder shall not be affected or impaired by any circumstance or occurrence whatsoever, including, without limitation: (a) any direction as to application of payment by the Guarantors or any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of a Guarantor or of any other party as to the Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Guarantors, (e) the failure of any Guarantor to receive any benefit from or as a result of its execution, delivery and performance of the Guaranty contained in this Agreement, (f) to the extent permitted by applicable law, any payment made to the Lenders on the indebtedness which the Lender repays to the Guarantors pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (g) any action or inaction by the Guarantors as contemplated in Section 13.05, or (h) any invalidity, rescission, irregularity or unenforceability of all or any part of the Obligations or of any security therefor. Each Guarantor understands, agrees and confirms that the Lenders may enforce this Guaranty up to the full amount of the Obligations against such Guarantor without proceeding against any other Guarantor, or against any security for the Obligations, or under any other guaranty covering all or a portion of the Obligations. This Guaranty shall constitute a guaranty of payment, and not of collection.

13.03    <u>Independent Obligation</u>. The obligations of each Guarantor hereunder are independent of the obligations of any other Guarantor, any other guarantor or any other party, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor, any other guarantor or any other party and whether or not any other Guarantor, any other guarantor or any other party be joined in any such action or actions. Each Guarantor waives, to the fullest extent permitted by applicable law, the benefits of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Guarantors or other circumstance which operates to toll any statute of limitations as to the Guarantors shall operate to toll the statute of limitations as to each Guarantor.

13.04    <u>Authorization</u>. Each Guarantor authorizes the Lenders (except as shall be required by applicable law, any order of the Bankruptcy Court or any Credit Document) at any time and from time to time without the consent of, or notice to, any Guarantor, without incurring responsibility to such Guarantor, and without affecting, releasing or impairing the Obligations or liability of such Guarantor hereunder, upon or without any terms or conditions and in whole or in part, to:

(a)    in accordance with the terms and provisions of this Agreement and the other Credit Documents, change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Obligations (including, without limitation, any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Obligations as so changed, extended, increased, accelerated, renewed or altered;

36

(b)    take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property or other Collateral by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)    exercise or refrain from exercising any rights against any Guarantor, any other guarantor of the Borrower, or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, other Guarantors, guarantors, or other obligors;

(e)    settle or compromise any of the Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Loan Parties to their respective creditors other than the Lenders;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Lenders regardless of what liability or liabilities of the Borrower remain unpaid;

(g)    consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or, pursuant to the terms of the Credit Documents, otherwise amend, modify or supplement this Agreement, any other Credit Document or any of such other instruments or agreements;

(h)    act or fail to act in any manner which may deprive such Guarantor of its right to subrogation against the other Guarantors to recover full indemnity for any payment made pursuant to the Guaranty hereunder; and/or

(i)    take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Guarantor from its liabilities under this Guaranty (including, without limitation, any action or omission whatsoever that might otherwise vary the risk of such Guarantor or constitute a legal or equitable defense to or discharge of the liabilities of a guarantor or surety or that might otherwise limit recourse against such Guarantor).

No invalidity, illegality, irregularity or unenforceability of all or any part of the Obligations, the Credit Documents or any other agreement or instrument relating to the Obligations or of any security or guarantee therefor shall affect, impair or be a defense to the Guaranty under this Agreement, and this Guaranty shall be primary, absolute and unconditional notwithstanding the occurrence of any event or the existence of any other circumstances which might constitute a legal or equitable discharge of a surety or guarantor except payment in full in cash of the Obligations.

37

13.05    <u>Continuing Guaranty and Reliance</u>. This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. No failure or delay on the part of the Lenders in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which the Lenders would otherwise have. No notice to or demand on any Guarantor in any case shall entitle such Guarantor to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lenders to any other or further action in any circumstances without notice or demand (in any such case, except to the extent notice is expressly required pursuant to any order of the Bankruptcy Court or any Credit Document). It is not necessary for the Lenders to inquire into the capacity or powers of each Guarantor or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

13.06    <u>Subordination</u>. Any indebtedness of the Guarantors now or hereafter held by and/or owing to any other Guarantor is hereby subordinated in right of payment to the Obligations owing to the Lenders; and if the Lenders so request at a time when an Event of Default exists and is continuing, all such indebtedness of the Guarantors to each of the other Guarantor shall be collected, enforced and received by any Guarantor as trustee for the Lenders and be paid over to the Lenders on account of the Obligations, but without affecting or impairing in any manner the liability of any Guarantor under the other provisions of this Guaranty. Without limiting the generality of the foregoing, each of the Guarantors hereby agrees with the Lenders that they will not exercise any right of subrogation which they may at any time otherwise have as a result of this Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Obligations have been irrevocably paid in full in cash. If and to the extent required in order for the Obligations of each of the Guarantors to be enforceable under applicable federal, state and other laws relating to the insolvency of debtors, the maximum liability of the Guarantors hereunder shall be limited to the greatest amount which can lawfully be guaranteed by the Guarantors under such laws, after giving effect to any rights of contribution, reimbursement and subrogation arising under this Section 13.06.

13.07    <u>Payments</u>. All payments made by any Guarantor hereunder will be made without setoff, counterclaim or other defense, will be made in the currency or currencies in which the respective Obligations are then due and payable and will be made on the same basis as payments are made by the other Guarantors under Sections 4.03 and 4.04 hereof.

13.08    <u>Reinstatement</u>. If any claim is ever made upon any Lender for repayment or recovery of any amount or amounts received in payment or on account of any of the Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having

jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant, then and in such event each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any Note or any other instrument evidencing any liability of any Guarantor, and such Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.09    Contribution. At any time a payment in respect of the Obligations is made under this Guaranty, the right of contribution of each Guarantor against each other Guarantor shall be determined as provided in the immediately following sentence, with the right of contribution of each Guarantor to be revised and restated as of each date on which a payment (a "Relevant Payment") is made on the Obligations under this Guaranty. At any time that a Relevant Payment is made by a Guarantor that results in the aggregate payments made by such Guarantor in respect of the Obligations to and including the date of the Relevant Payment exceeding such Guarantor's Contribution Percentage (as defined below) of the aggregate payments made by all Guarantors in respect of the Obligations to and including the date of the Relevant Payment (such excess, the "Aggregate Excess Amount"), each such Guarantor shall have a right of contribution against each other Guarantor who has made payments in respect of the Obligations to and including the date of the Relevant Payment in an aggregate amount less than such other Guarantor's Contribution Percentage of the aggregate payments made to and including the date of the Relevant Payment by all Guarantors in respect of the Obligations (the aggregate amount of such deficit, the "Aggregate Deficit Amount") in an amount equal to (x) a fraction the numerator of which is the Aggregate Excess Amount of such Guarantor and the denominator of which is the Aggregate Excess Amount of all Guarantors multiplied by (y) the Aggregate Deficit Amount of such other Guarantor. A Guarantor's right of contribution pursuant to the preceding sentences shall arise at the time of each computation, subject to adjustment to the time of each computation; provided that no Guarantor may take any action to enforce such right until the Obligations have been irrevocably paid in full in cash and the Commitment have been terminated, it being expressly recognized and agreed by all parties hereto that any Guarantor's right of contribution arising pursuant to this Section 13.09 against any other Guarantor shall be expressly junior and subordinate to such other Guarantor's obligations and liabilities in respect of the Obligations and any other obligations owing under this Guaranty. As used in this Section 13.09: (i) each Guarantor's "Contribution Percentage" shall mean the percentage obtained by dividing (x) the Adjusted Net Worth (as defined below) of such Guarantor by (y) the aggregate Adjusted Net Worth of all Guarantor's; (ii) the "Adjusted Net Worth" of each Guarantor shall mean the greater of (x) the Net Worth (as defined below) of such Guarantor and (y) zero; and (iii) the "Net Worth" of each Guarantor shall mean the amount by which the fair saleable value of such Guarantor's assets on the date of any Relevant Payment exceeds its existing debts and other liabilities (including contingent liabilities, but without giving effect to any Obligations arising under this Guaranty) on such date. All parties hereto recognize and agree that, except for any right of contribution arising pursuant to this Section 13.09, each Guarantor who makes any payment in respect of the Obligations shall have no right of contribution or subrogation

39

against any other Guarantor in respect of such payment until all of the Obligations have been irrevocably paid in full in cash. Each Guarantor recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution. In this connection, each Guarantor has the right to waive its contribution right against any Guarantor to the extent that after giving effect to such waiver such Guarantor would remain solvent, in the determination of the Lenders.

13.10    Limitation on Obligations. Each Guarantor and each Lender (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act of any similar federal or state law. To effectuate the foregoing intention, each Guarantor and each Lender (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors, result in the Obligations of such Guarantor in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

SECTION 14. The Administrative Agent

14.01    Actions

(a)    Each Lender hereby appoints Silver Point as its Administrative Agent under and for purposes of each Credit Document. Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Credit Document and to appoint other agents or sub-agents to assist in its actions under the Credit Documents and the Administrative Agent shall not be liable for the acts and omissions of such agents as long as they are appointed with due care and without gross negligence or willful misconduct.  Each Lender further authorizes the Administrative Agent, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent, to exercise such powers hereunder and thereunder as are delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto.

(b)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders in accordance with the terms of this Agreement (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.1).  Each Lender hereby indemnifies (which indemnity shall be payable within thirty (30) days of demand therefor, to the extent not reimbursed by the Loan Parties or

40

any other Lender, and without limiting the Borrower and Loan Parties' obligations under this Agreement and which indemnity shall survive any termination of this Agreement) the Administrative Agent and its officers, directors, employees and agents, pro rata according to the proportionate amount of Loans held by such Lender, from and against any and all liabilities, obligations, losses, damages, claims, penalties, judgments, costs, disbursements or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Credit Document or any action taken or omitted to be taken by the Administrative Agent under the Credit Documents, (including reasonable attorneys' fees and expenses), and as to which the Administrative Agent, is not reimbursed by the Loan Parties; provided that, no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct.

14.02    Exculpation.

Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Lender for any action taken or omitted to be taken by it under any Credit Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Credit Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Credit Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Credit Party of its Obligations.  Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

To the fullest extent permitted by applicable law, no Lender shall assert, and each Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Credit Document or any agreement or instrument contemplated hereby or thereby or the transactions contemplated hereby or thereby, shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers unless it is indemnified to its

satisfaction and the Administrative Agent shall have no liability to any person for any loss occasioned by any delay in taking or failure to take any action while it is awaiting an indemnity satisfactory to it.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Credit Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Credit Documents delivered to it after the date of this Agreement; provided, however, that such additional Credit Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Credit Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrower that in the sole reasonable judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Credit Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Credit Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

The Administrative Agent shall not be under any obligation to exercise any of its rights or powers vested in it by this Agreement or the other Credit Documents, at the request, order or direction of the Required Lenders unless the same is given pursuant to the express provisions of this Agreement or the other Credit Documents and the Required Lenders shall have offered to the Administrative Agent security or indemnity reasonably satisfactory to the Administrative Agent against the costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) which might be incurred therein or thereby.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in

42

the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith without gross negligence or willful misconduct.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future Secured Parties concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole reasonable discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous material into the environment.

14.03    Successor. The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrower and all Lenders.    The Administrative Agent may be removed at any time upon the affirmative vote of the Required Lenders.  If the Administrative Agent at any time shall resign or be removed, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder.  In the case of the Administrative Agent's resignation, if no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder

43

until such time, if any, as the Required Lenders appoint a successor as provided for above. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of the reasonable fees and expenses (including attorney's fees and expenses) of the resigning or removed Administrative Agent), such successor Administrative Agent shall be entitled to receive from the retiring or removed Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring or removed Administrative Agent.   The retiring or removed Administrative Agent shall cooperate in all respects with the transition of the Administrative Agent role to the successor Administrative Agent and shall, following such transition, be discharged from its duties and obligations under the Credit Documents.   After any retiring or removed Administrative Agent's resignation or removal, as applicable, hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Credit Documents.

14.04     Loans by the Administrative Agent. The Administrative Agent shall have the same rights and powers with respect to (x) the Loans held by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent. The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if the Administrative Agent were not the Administrative Agent hereunder.

14.05     Credit Decisions. Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrower, the Credit Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend the Loans. Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Credit Documents.

14.06     Copies, etc. The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrower pursuant to the terms of the Credit Documents (unless concurrently delivered to the Lenders by the Borrower).   The Administrative Agent will distribute to each Lender each document or instrument received for its account and copies of all other communications received by the Administrative Agent from the Borrower for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Credit Documents.

14.07     Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including

any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Credit Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders or all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.

14.08    Defaults.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to the provisions of Section 10.1) take such action and exercise such remedies with respect to such Default as shall be directed by the Required Lenders pursuant to any of the Credit Documents; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action (including, without limitation, credit bidding the Loans of all Lenders hereunder), or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders.

14.09    Posting of Approved Electronic Communications.

(a)    The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Credit Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (ii) provides notice of any Default under this Agreement or any other Credit Document or (iii) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Credit Documents but only to the extent requested by the Administrative Agent.

45

(b)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".    THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.    NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.    IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(c)    The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.    Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.    Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

* * *

46

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

NEW COTAI., LLC
NEW COTAI HOLDINGS, LLC
NEW COTAI VENTURES, LLC
NEW COTAI CAPITAL CORP.


By: _____
    Name:
    Title:
    Address:
    Telephone:
    Facsimile:

SILVER POINT FINANCE, LLC
as the Administrative Agent

By: _____
      Name:
      Title:

SPCP GROUP, LLC
as a Lender

By: _____
    Name:
    Title:

SCHEDULE I

Commitments

| Lender | | Commitment |
|---|---|---|
| SPCP Group, LLC | | $6,250,000 |
| | | |
| **Total** | | **$6,250,000** |